[No. H020015. Sixth Dist. June 4, 2001.]

RICHARD CRAWFORD WYCKOFF et al., Plaintiffs and Appellants, v. THE STATE OF CALIFORNIA, Defendant and Respondent.

## COUNSEL

Greene, Broillet, Taylor, Wheeler & Panish, Browne Green, Geoffrey Stuart Wells; Esner & Chang, Stuart B. Esner and Andrew N. Chang for Plaintiffs and Appellants.

Brelend C. Gowan, David Gossage, Kathleen Calder and Kenneth G. Nellis for Defendant and Respondent.

## OPINION

**WUNDERLICH, J.**—Plaintiff Richard Crawford Wyckoff was injured and his wife and two children were killed when a driver heading northbound on State Route 85 crossed the center median and crashed head-on into plaintiff's southbound vehicle. Plaintiff sued the State of California (State) for damages for personal injury and wrongful death on the theory that the lack of a center median barrier at the collision site constituted a dangerous condition of public property. The trial court granted summary judgment for the State on the ground of design immunity (Gov. Code, § 830.6). Plaintiff appeals, contending (1) the State failed to establish the affirmative defense of design immunity, or (2) if it did establish initial design immunity, it lost that immunity by the time of the accident because of changed circumstances at the accident site. For reasons we shall explain, we affirm the judgment.

### FACTS

#### A. *The Accident*

On July 25, 1996, plaintiff Richard Wyckoff was driving his Mercedes sedan southbound on State Route 85, approximately two-tenths of a mile south of Saratoga Avenue. His wife, who was pregnant with twins, was traveling as a passenger in the car. At approximately 9:25 p.m., Donald Charles Garrett, a northbound driver, veered across the center median area of the freeway in his Toyota pickup truck and struck plaintiff's car, causing severe injuries to plaintiff and massive traumatic head and chest injuries to his wife. According to newspaper articles in the record, plaintiff's wife was taken to the hospital and kept alive long enough to deliver the twins by cesarian section. However, the twins died shortly thereafter. Garrett, the driver of the Toyota pickup, also died in the accident.

#### B. *Design of State Route 85*

The portion of State Route 85 where the accident occurred was designed in 1991 pursuant to State Contract No. 04-437744. The designs for the

three-mile project, which ran from 0.1 miles east of Winchester Boulevard to 0.3 miles west of Saratoga Avenue, were approved by state officers and engineers who had the power and authority to approve design plans. At the accident site (milepost 13.4), the design called for a 46-foot-wide median. Construction was completed on the project, and the freeway was opened to the public on October 19, 1994.

At the time the design was approved, the State warrants that were in effect for median barriers were contained in the 1987 Traffic Manual. Section 7-02.3 of that manual provides: "A. *Freeways*. The median barrier warrants shown in Figure 7-5[1] have been developed through extensive study of freeway cross-median accidents. Barriers should be provided on freeways whenever these warrants are met unless there are unique circumstances to justify omitting the barrier. Any decision not to install a barrier where warrants are met should be thoroughly documented. [¶] When the ADT is less than 20,000, the probability of an out-of-control vehicle crossing the median and colliding with an opposing vehicle is low. When the median width is above 45 feet, the probability of an out-of-control vehicle reaching the opposing lanes is low. Barriers in these cases should be considered only if there is an unusually high number or rate of cross-median accidents involving opposing vehicles. A cross-median accident is defined as strictly one in which a vehicle crosses the median and strikes, or is struck by, a vehicle from the opposite direction. [¶] With any ADT or median width, barriers should be considered if there has been a high rate of cross-median accidents involving opposing vehicles. A rate of 0.50 cross-median accidents per mile per year of any severity or 0.12 fatal cross-median accidents involving opposing vehicles justifies further analysis to determine the advisability of a barrier. [¶] Median barriers should be provided on new construction whenever it is anticipated that they will be warranted within five years after construction."

As of the date of plaintiff's accident, the State's accident warrants had not been met under either the traffic volume/median width warrants or the accident warrants.

Further facts will be discussed in connection with plaintiff's various contentions.

STANDARD OF REVIEW

■ "[T]he normal rules governing a motion for summary judgment, and requiring its denial if any triable issue of fact appears, are not fully applicable [to cases involving design immunity under Government Code section

---

[1]Figure 7-5 is a graph showing that barriers are warranted for medians up to 45 feet so long as the average daily traffic (ADT) is at least 20,000.

830.6.] For example, the defendant is not required to prove to the court that the design or plan was in fact a reasonable one. Instead, the defendant is merely required to adduce any 'substantial evidence' that a reasonable public employee or legislative body could have approved the plan or design used under [Government Code section] 830.6. Thus, when the defendant files a motion for summary judgment, the existence of a possible conflict of evidence, as shown by the proof submitted on the motion, will not create a triable issue on this aspect of the defense that can defeat a summary judgment . . . ." (2 Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th. ed. 2001) Dangerous Condition of Public Property, § 12.74, p. 842.) "We are not concerned with whether the evidence of reasonableness is undisputed; the statute provides immunity when there is substantial evidence of reasonableness, even if contradicted. [Citations.]" (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 939-940 [67 Cal.Rptr.2d 454].)

DISCUSSION

A. *Design Immunity—General Principles*

A public entity may be liable for negligently creating an injury-producing dangerous condition of its property or for failing to remedy a dangerous condition despite having had notice and sufficient time to protect against it. (Gov. Code, § 835, subd. (a).) However, there is no liability "for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval, . . . if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design . . . or (b) a reasonable legislative body or other body or employee could have approved the plan or design." (Gov. Code, § 830.6.)

■ "The rationale behind design immunity 'is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design.' [Citation.] ' "[T]o permit reexamination in tort litigation of particular discretionary decisions where reasonable [persons] may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." ' " (*Cameron v. State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777]; accord, *Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 524-525 [237 Cal.Rptr. 505]; *Morfin v. State of California* (1993) 12 Cal.App.4th 812, 815 [15 Cal.Rptr.2d 861].)

A public entity claiming design immunity must plead and prove the following three essential elements, " '(1) [a] causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; [and] (3) substantial evidence supporting the reasonableness of the design.' " (*Higgins v. State of California* (1997) 54 Cal.App.4th 177, 185 [62 Cal.Rptr.2d 459].)

"Section 830.6 design immunity is asserted as an affirmative defense in actions arising out of an alleged dangerous condition of public property. It is ordinarily raised on a motion for summary judgment or nonsuit; the court decides whether there is sufficient evidence to support it. [Citation.] It is error to submit the issue to a jury. [Citation.]" (*Higgins v. State of California, supra*, 54 Cal.App.4th at p. 184.)

B. *Plaintiff's Contentions*

1. *Did State Route 85 conform to design plan?*

■ Plaintiff contends that "design immunity is not available to the State, since route 85, as built, never conformed to the design plans: the design called for a minimum 46-foot median, and route 85 was built with a 45-foot median."

Plaintiff points out that in order to avail itself of the affirmative defense of design immunity, the public entity must demonstrate that the improvement as designed "conformed to a design approved by the public entity vested with discretionary authority," citing *Cameron v. State of California, supra,* 7 Cal.3d at page 326. Here, plaintiff asserts, "it is undisputed that the subject median did not conform to the State's design or plan. The design or plan called for a 46-foot median. Plaintiffs submitted evidence that the median was 45.3 feet." As we shall explain, we conclude, as did the trial court, that the improvement as built did not materially depart from the design approved by the public entity. Thus, the affirmative defense of design immunity is available to the State.

The evidence showed that the accident occurred at milepost 13.4 on State Route 85, approximately two-tenths of a mile south of Saratoga Avenue. The design called for a 26-foot median with a 10-foot shoulder on each side of the median, resulting in a 46-foot separation between the northbound and southbound driving lanes. However, the actual size of each segment as constructed apparently varied by a matter of a few inches. The size also varied by who was doing the measuring. For example, Howard Anderson, plaintiff's consulting engineer, measured the shoulders on both sides of the

freeway for a distance of 200 feet. None was exactly 10 feet; they varied from 9 feet 10½ inches to 10 feet 11 inches. Adding the shoulder widths to the center median, Anderson came up with a distance between driving lanes that varied from 45 feet 1 inch to 45 feet 5 inches. Richard N. Smith, the State's expert, also measured the medians for 200 feet along milepost 13.4. He found the average width was 45.8 feet, or 45 feet 10 inches. The highway patrol officer who prepared the collision report measured the median width at the site of the collision as 45.3 feet, or 45 feet 4 inches. Department of Transportation (CalTrans) branch engineer Amir Sanatkar also measured the width at 45.3 feet or 45 feet 4 inches. The average of these four measurements is slightly over 45 feet 5 inches.

Testimony was adduced that when a figure is used in engineering or mathematics, such as the figure "46 feet," "that implies that—that it should be between 45.50 to 46.49 [feet] to the nearest significant figure." Such a spread is not even considered a deviation; it is simply a generally accepted construction tolerance. State expert Smith was asked if he had "ever seen [the State] meet [a 45-foot or 60-foot design] right on the nose or not?" He responded, "Yes. I've seen some that were on, at least in one place or two places." Then he was asked, "So it can be done; correct?" Smith answered, "It can be done with a lot more expense. If you wanted to be precise everywhere, you're going to find the road is going to cost you a lot." CalTrans Chief Deputy H. Paul Hensley explained that it would not be unusual for each segment to "vary a couple inches either way." For example, the 26-foot median would have a center line that CalTrans would use to design the freeway. According to the design drawings, the middle of that centerline to the edge of the asphalt should be "approximately" 13 feet. "It would be approximately, because when they go out there and pave, it doesn't come out exactly." After the 26-foot median, the shoulder should be approximately an additional 10 feet on each side.

Exactly where the painters place the striping can also affect the width of the median. Plaintiff's expert Jarvis Michie, a highway safety consulting engineer, noted that "The width of the traveled way is . . . determined primarily by the location of pavement edge striping. . . . That is, traffic will guide on the pavement edge striping or edge line and not on the concrete pavement edge; thus the edge line is the boundary of the traveled way. Accordingly, median widths for cross median safety purposes are generally measured from yellow edge line to yellow edge line."

Here, as noted above, the average of the various median measurements was approximately 45 feet 5 inches, or 7 inches short of what the design plans specified. Thus, the deviation is slightly more than what would be

expected under the generally accepted construction tolerance of 45.50 to 46.49 feet. Plaintiff contends that this discrepancy precludes the State from relying on the design immunity defense and relies for this proposition ·on *Cameron v. State of California, supra,* 7 Cal.3d at page 326 and, to a lesser extent, on *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 574 [136 Cal.Rptr. 751]. A perusal of those cases shows that they are distinguishable.

In *Cameron*, the plaintiffs were injured when their car went out of control while attempting to negotiate an "S" curve on rural Highway 9 in Santa Cruz. The State submitted proof that design plans had been prepared in the mid-1920's by the county surveyor and that the Santa Cruz County Board of Supervisors had approved the design. However, the plaintiffs submitted evidence that what caused the accident was a "superelevation on the curve [that] was not consistent across the roadway, but changed abruptly," and that this superelevation was not part of the design plans. (*Cameron v. State of California, supra,* 7 Cal.3d at p. 323.) In denying the State the affirmative defense of design immunity, the California Supreme Court observed that "there is no evidence showing that the uneven superelevation was the result of a design or plan approved by the Santa Cruz County Board of Supervisors. . . . [¶] . . . The state merely showed that the Santa Cruz Board of Supervisors approved a design showing the course of the right of way and the elevation above sea level of the white center stripe for the road. The design plan contained no mention of the superelevation intended or recommended. Therefore such superelevation as was constructed did not result from the design or plan introduced into evidence and there was no basis for concluding that any liability for injuries caused by this uneven superelevation was immunized by section 830.6." (*Id.* at pp. 325-326.)

In other words, in *Cameron*, what caused the accident—uneven superelevation—was not in the plans. In the instant case, in contrast, what caused the accident—the absence of a median barrier—was part of the design.

*Mozzetti v. City of Brisbane, supra,* 67 Cal.App.3d ·565 is also distinguishable. In that case, the owner of a motel and trailer park sued the city for flood damage caused by the city's negligent resurfacing of streets and construction of a sidewalk next to the plaintiff's property. The city raised the defense of design immunity. In denying the city that defense, the court noted that the engineering plan submitted to the city council for approval was "no more than a 'surface drawing,' which failed to designate formal cross-sections, plans, specifications, elevations, grades or slopes." (*Id.* at p. 570.) Furthermore, "during the course of construction several changes were made that were neither designated nor contemplated in the original plan. Thus, during the progress of the construction, Visitacion Mall was widened from

40 to 50 feet. In deviation from the approved plan the raised barrier designed to prevent surface water from flowing into the motel was eliminated and instead a concrete valley gutter with inadequate catch basins and drains was installed. Also, at variance with the original plan which permitted a maximum of three-inch asphalt thickness, the sidewalk and curb elevations along both Visitacion Mall and Old County Road were considerably higher. In point of fact, engineer Wolff testified that as much as 14 inches were added to the height of Visitacion Mall at the edge of the street immediately adjacent to the motel." (*Id.* at p. 570.) In holding that the city could not claim design immunity, the court noted, "Although there was testimony to the effect that the mall Project was approved by the city council, the evidence is uncontradicted that the one-page surface drawing so approved did not show the requisite details of the road design; that there were several changes during the construction which materially affected respondents' property; and that no satisfactory evidence was produced that such changes were approved by either the city council or a public employee possessing discretionary authority." (*Id.* at p. 574.)

In the instant case, in contrast, the highway as built substantially conformed to the plans. The only exception was that the median, which was designed not to include a barrier, was a couple inches short of what would be expected under the generally accepted construction tolerance of 45.50 to 46.49 feet. As the State's expert, Richard Smith, noted, "The fact that the design called for a median width of 46 feet and the actual median as constructed was less than 46 feet (by my measurements only 0.2 of a foot less than 46 feet) is not significant. The actual roadway as constructed was in conformity with the then-existing policy regarding median barrier placement, i.e. a median barrier was not called for at the subject location."

2.  *Is there a question of fact whether state warrants require a barrier on freeways with medians under 46 feet?*

■ Plaintiff contends "that there was conflicting evidence whether the subject improvement even met the applicable general design guidelines." He charges that even though "CalTrans' expert witness Smith declared that barriers would not generally be constructed where the median was more than 45-feet in width, plaintiff presented sworn testimony from CalTrans' Chief Deputy H. Paul Hensley which explained that the minimum standard was *not* 45 feet, but rather *46 feet*. . . . [¶] In ruling on the summary judgment motion, the trial court seemingly disregarded plaintiffs' evidence on this issue. In so doing the court erred. The court's sole function on a motion for summary judgment is issue-finding, not issue-determination." As we shall explain, we disagree that there is a triable issue of fact on this matter.

In *Alvarez v. State of California* (1999) 79 Cal.App.4th 720 [95 Cal.Rptr.2d 719], the court discussed how the State determines when median barriers are warranted, as follows: "Median barriers result in a trade-off. They prevent nearly all cross-median accidents, but usually result in an overall increase in accidents and injuries. A median barrier is a fixed object which, when hit, can cause serious injury either by direct impact or by deflecting vehicles back into traffic. In addition, a barrier eliminates half the recovery area for out-of-control vehicles. Based on studies of the effectiveness of median barrier placement, California has developed a median barrier policy. The policy reflects the fact that as traffic volumes rise, the chance that an errant vehicle will cross the median and strike an opposing vehicle increases. But as the median reaches a certain width, it is less likely that those events will occur. With medians 46 feet or wider,[2] regardless of traffic volume, the benefits of preventing cross-median accidents and injuries by barrier placement are outweighed by the disadvantages of the accidents and injuries generated by a barrier. The only exception to this rule is at those locations where there is a demonstrable history of excessive cross-median accidents: an accident rate of 0.12 fatal or 0.50 total cross-median accidents per mile per year.

"The State policy—median barriers should be installed on freeways only if the result of striking the barrier is less severe than the result if no barrier existed—is reflected in median barrier warrants. There are two types of warrants, traffic volume/median width warrants (traffic volume/width warrants) and accident warrants. Traffic volume/width warrants index traffic volume to median width. Accident warrants index the frequency and severity of traffic accidents at a given locale with a state average. The California Department of Transportation (CalTrans) Traffic Manual described 'warrants' as follows: 'Warrants provide guidance to the engineer in evaluating the potential safety and operational benefits of traffic control devices and are based upon "average" or "normal" conditions. Warrants are not a substitute for engineering judgment. The fact that a "warrant" for a particular traffic control or safety device is met is not conclusive justification for the installation of the device. The unique circumstances of each location and the amount of funds available for highway improvements must be considered in determining whether or not to install a traffic control or safety device.' " (*Alvarez v. State of California, supra,* 79 Cal.App.4th at pp. 724-725.)

---

[2]*Alvarez* dealt with the median barrier policy (§ 8-605.3 of the State Planning Manual) in effect in 1967 when the section of State Route 99 that was the subject of the *Alvarez* lawsuit was designed and built. Section 8-605.3 did not call for median barrier installation on new facilities with medians wider than 46 feet except in certain limited circumstances. (*Alvarez v. State of California, supra,* 79 Cal.App.4th at p. 734.) The median barrier policy in effect in 1991 (§ 7-02.3 A. of the State Traffic Manual), when the design for State Route 85 was approved, and in 1994, when State Route 85 was built, did not call for median barrier installation on new facilities with medians wider than 45 feet except in limited circumstances.

The evidence presented in this case (Traffic Manual § 7-02.3) undisputedly shows that the State's written policy in 1991 did not call for median barrier installation on new facilities with a median wider than 45 feet. The State's expert, Richard N. Smith, explained that standards had changed over the years, but that at the time of the design of State Route 85, its construction in 1994, and the accident in 1996, the standards did not require barriers in medians 45 feet or wider. Smith declared that he conducted a study for the State and authored a report on median barrier placement in 1977. Based on that study, the State lowered its then 50-foot standard to 45 feet because the study found "that general installation of barrier in those wider medians resulted in no decrease in fatal accidents, but a 5 to 6 fold increase in injury accidents and a 20 fold increase in property damage accidents. As a result, by the fall of 1978 the State median barrier warrant was returned to the earlier standard, which generally excluded barrier on medians wider than 45 feet except where there is a demonstrable and excessive cross-median accident history in the prior five full years. That standard, embodied in the State's Traffic Manual, Figure 7-5 (Exhibit A) was in effect when SR [State Route] 85 was designed, built, and opened to the public in October of 1994; and remained in effect on July 25, 1996." Also, as of the date of the accident, the national AASHTO (American Association of State Highway and Transportation Officials) warrants for consideration of median barrier installation recommended barriers only on medians up to 30 feet, except in cases where there had been a history of cross-median accidents.

Notwithstanding this evidence, plaintiff contends that a triable issue of fact was raised because CalTrans Chief Deputy H. Paul Hensley stated in deposition, "*Generally* when applying the standards, if it was 46 feet—if it was less than 46 feet, we would put a barrier in. If it was more than 46 feet—there may be an inconsistency in there, but in the application, that was *generally* what we followed." (Italics added.) Hensley did not know that "prior to 1977, the barrier width was 50 feet or greater," even though he worked for CalTrans at the time. Nor was he familiar with Richard Smith's 1977 report that resulted in the policy embodied in Traffic Manual section 7-02.3.

The State contended that plaintiff took Hensley's reference to 46 feet out of context, and it objected to his oral testimony on the ground that the written warrant containing the 45-foot standard "speaks for itself." Although the trial court did not specifically rule on the State's objection, on appeal from a summary judgment, it is presumed that the trial court did not consider irrelevant or incompetent evidence. (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 864 [84 Cal.Rptr.2d 157].)

We conclude that Hensley's equivocal deposition answer is insufficient to raise a triable issue of fact and that the evidence presented is susceptible to only one conclusion: that official state policy did not call for median barrier installation on new construction with medians 45 feet or wider on the date of the accident.

### 3. *Did changed circumstances justify a median barrier?*

Plaintiff alternatively argues that if the State established initial design immunity, that immunity was lost when changed circumstances made the location a dangerous condition.

"Design immunity under section 830.6 is not perpetual but may be lost as a result of changed circumstances which subsequently render the improvement dangerous, if the public entity has received actual or constructive notice thereof. [Citation.] If the approved design becomes dangerous by reason of any change in conditions, and that fact is known to the public entity, the immunity will continue for only a reasonable period of time to allow the entity to obtain funds to carry out the remedial work of bringing the property back into conformity with a reasonable design or plan. (§ 830.6.) Thus, there are at least two predicates to loss of design immunity: changed conditions and notice. [Citation.]" (*Compton v. City of Santee* (1993) 12 Cal.App.4th 591, 598 [15 Cal.Rptr.2d 660].)

It was in *Baldwin v. State of California* (1972) 6 Cal.3d 424, 438 [99 Cal.Rptr. 145, 491 P.2d 1121], that the California Supreme Court first held that design immunity may be lost where changed conditions have produced a dangerous condition of which the public entity has notice. In that case, the plaintiff, who was driving north on a four-lane highway in Richmond, waited in the high-speed left lane to make a left turn, and was hit from behind by another motorist. After he sued the State, the State defended on the ground of design immunity, providing evidence that the 1942 plan for the intersection did not include a left turn lane, and that the plan was reasonable when made and properly approved by authorities with discretionary power to approve the plans. In later years, however, traffic increased enormously. Beginning in 1961, the Division of Highways started receiving complaints from police, business owners, the city council and others, calling attention to the serious danger posed by the lack of a left-turn lane, which had resulted in numerous traffic injuries, including four fatalities. The division notified the city that it was restudying the conditions, but took no action.

Relying on the New York *Weiss* rule (*Weiss v. Fote* (1960) 7 N.Y.2d 579 [200 N.Y.S.2d 409, 167 N.E.2d 63]), the court held, "The clear teaching of

*Weiss* is that design immunity persists only so long as conditions have not changed. Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan. Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard." (*Baldwin v. State of California, supra,* 6 Cal.3d at p. 434, fn. omitted.) The court went on to conclude: "[W]here a plan or design of a construction of, or improvement to, public property, although shown to have been reasonably approved in advance or prepared in conformity with standards previously so approved, as being safe, nevertheless in its actual operation under changed physical conditions produces a dangerous condition of public property and causes injury, the public entity does not retain the statutory immunity from liability conferred on it by [Government Code] section 830.6." (*Id.* at p. 438, fn. omitted.)

In the instant case, plaintiff contends that *Baldwin* is "dispositive" because "[h]ere, we have the same two changed physical conditions, along with a third condition that was not present in *Baldwin.*" He points out that traffic volume on State Route 85 doubled between 1991, when the freeway was designed and approved, and the time of the accident, and that in the two-year period between 1994, when State Route 85 opened, and 1996, when the accident occurred, there were eight to nine cross-median accidents. In addition, in 1995, the speed limit on State Route 85 was increased from 55 to 65 miles per hour.

Regarding the increase in traffic volume, *Higgins v. State of California, supra,* 54 Cal.App.4th 177, is instructive. In that case, two individuals sued the State after sustaining injuries in a cross-median accident that allegedly could have been prevented had there been a median barrier. The trial and appellate courts found the State was entitled to the complete defense of design immunity under Government Code section 830.6 and that the exception to immunity for changed conditions did not apply. Specifically, the court found that the fact that traffic volume had more than doubled since the original plan did not constitute a changed condition. It explained, "Higgins next asserts increased traffic constitutes a changed circumstance mandating the placement of a median barrier and defeating design immunity. Krueper declared the traffic volume in the vicinity was two and one-half times greater in 1990 than it was in 1980. So what? Abstract numbers prove nothing. Smith declared the state standard for placement of median barriers was calculated with reference to traffic volume and width of the median, and the subject freeway plans, original and subsequent, conformed to the standard. Higgins's evidence did not controvert the state's evidence." (*Higgins v. State of California, supra,* 54 Cal.App.4th at p. 188.)

In the instant case, the same Richard N. Smith who testified in *Higgins*, author of the 1977 study that led to promulgation of Traffic Manual section 7-02.3, explained that even though traffic increased from 46,000 vehicles per day in 1990 to 95,000 vehicles per day near the site of the accident and to 110,000 vehicles per day elsewhere on State Route 85 in 1996, this increase did not exceed the design capacity of the freeway. In fact, the peak hour volume of 7,800 vehicles in 1996 was still substantially below the designed hourly volume of 9,100 vehicles. He further declared that the State warrants on the day of the accident did not require a barrier because the median width was more than 45 feet. A June 1991 comprehensive review of the State's median barrier policy concluded that there should be no change in the State's volume/width warrants. Under these circumstances, we conclude that the increase in traffic volume did not constitute a changed condition.

Regarding the change in speed limit from 55 miles per hour in 1991 to 65 miles per hour in 1995, plaintiff's evidence is insufficient to raise a triable issue of fact that this constitutes a changed condition. As Smith explained, "there is no conclusive evidence that posting higher speed limits results in a direct correlation with higher cross-median accident rates. Notably, research has shown that prior to elimination of the national 55 mph speed restriction drivers were widely ignoring that restriction. As seen in Exhibit BB, a State study showed that just prior to elimination of the restriction the 85th percentile freeway speed (the speed at or below which 85 percent of the drivers are traveling) in California was 68.3 mph, while after that restriction was lifted the 85th percentile speed in California was 68.7 mph—an increase of about one half of one percent." He further explained that neither the California warrants nor the AASHTO warranting criteria mention speed as a criteria for the warrants. In fact, accident rates are generally higher, he noted, on two-lane conventional roadways, where prevailing speeds are typically much lower than on high-speed freeways.

Although plaintiff's expert Michie opined that "traffic speed has profound effects on the causation and consequences of cross median collisions," he admitted that "CalTrans traffic volume/median width . . . warranting criteria is an empirical relationship based on numerous cross median collisions and explicitly uses two of the three factors governing cross median collision probabilities, namely traffic volume and median width. Not explicitly included is *traffic speed*." Plaintiff's other expert, Anderson, also opined that "[t]raffic speed has significant effects on the causation and consequences of cross median collisions." However, as the court noted in *Grenier v. City of Irwindale, supra,* 57 Cal.App.4th at page 941, "That a plaintiff's expert may disagree does not create a triable issue of fact." (Accord, *Higgins v. State of California, supra,* 54 Cal.App.4th at p. 186; *Compton v. City of Santee, supra,* 12 Cal.App.4th at pp. 596-597.)

Regarding the nine prior cross-median accidents, the trial court concluded that plaintiff failed to show that the accident rate was sufficiently unusual or excessive to put the State on notice of a dangerous condition.[3] We agree. Although there were a total of nine cross-median accidents on State Route 85, they were not concentrated, but occurred from one end of the 24-mile freeway to the other. Four involved property damage only. Just two occurred within the three-mile construction project in which plaintiff's accident occurred. Furthermore, none was within a mile (i.e., a half-mile on either side) of plaintiff's accident. As the State's expert Smith explained, "the cross-median accident rate at this location was zero (0) accidents per mile per year. In contrast, the general rate of 0.50 accidents per year (based on a minimum of 3 accidents in 5 years) is necessary to qualify this location for consideration of barrier installation." Plaintiff did not dispute that the State's accident warrants had not been met.

Again, three recent cases are instructive. In *Compton v. City of Santee, supra,* 12 Cal.App.4th at pages 596-597, where there were four prior accidents in less than five years at the allegedly dangerous intersection, the court stated, "Evidence showed that each year approximately 4,469,920 vehicles traveled southbound through the intersection, while approximately 136,649 vehicles traveled northbound and negotiated the left turn. Though somewhat ambiguous, the facts reveal there were between zero and four other accidents similar to Compton's accident at the intersection in the nearly five-year period preceding the accident. To prove that this accident history put City on 'notice' of the 'dangerous condition,' it was incumbent on Compton to show this rate was statistically aberrant, i.e., unusual or excessive in some respect. No such evidence appears in this record. Nowhere does plaintiff produce evidence that one accident per year in an intersection carrying 4.5 million vehicles per year is sufficiently beyond ordinary statistical probabilities to alert City of the dangerous nature of the intersection." (*Id.* at pp. 599-600, fn. omitted.) Similarly, in the instant case, the evidence shows that with an average daily traffic volume of 95,000 vehicles, over 34,500,000 vehicles

[3]The court's order on summary judgment states, in pertinent part, "The Court also finds that absent a showing of changed conditions that the existence of nine crossover accidents (some involving property damage only) in the two year period prior to plaintiffs' accident is insufficient to establish a loss of design immunity. (*Compton v. City of Santee*[, *supra,*] 12 Cal.App.4th 591, 598.[)] In short, even though there may be a significant accident history which shows the original design to be dangerous, that is insufficient to establish loss of design immunity where plaintiffs have failed to show a change in physical conditions from those existing at the time the design plan was approved. Alternatively, even assuming that the accident rate was sufficient to constitute a changed condition, there is no showing that the accident rate was sufficiently unusual or excessive to put defendant on notice of a dangerous condition. (['\]statistically aberrant[']: *Compton v. City of Santee, supra,* 12 Cal.App.4th at p. 599.)"

used State Route 85 each year. Plaintiff has not shown that nine cross-median accidents over a 24-mile freeway over a period of 21 months is sufficiently statistically aberrant to put the State on notice.

In *Higgins v. State of California, supra,* 54 Cal.App.4th 177 the court held that the exception to immunity for changed conditions did not apply even though there were three prior accidents in four years at the accident site. "As for the accident history," the court explained, "the state concedes there were two cross-median accidents in 1987, [and] one in 1989. . . . Krueper attested, 'By the state's own standards, such a high incidence of cross-median accidents within a one-mile stretch of roadway within a three and one-half year period should have warranted an investigation concerning the placement of a median barrier.' But Smith testified the accident rate was below the .50 ratio which, under state standards, would trigger an investigation. . . . Moreover, Higgins failed to show the accident rate was 'statistically aberrant, i.e. unusual or excessive in some respect.' [Citation.]" (*Id.* at pp. 188.)

Finally in *Alvarez v. State of California, supra,* 79 Cal.App.4th 720, there were seven cross-median accidents within the 3.42-mile area surrounding the accident site that lacked a barrier. The court found no changed circumstances justifying an exception to the immunity of Government Code section 830.6. The court noted, "There must be evidence that the design, under changed physical conditions, has produced a dangerous condition of which the State is aware. [Citations.] [¶] . . . [A]n improvement may come to constitute a dangerous condition if increased traffic at the site, *coupled with an aberrant accident history,* indicates its dangerousness. (See, e.g., *Baldwin, supra,* 6 Cal.3d at pp. 428-429 [13 accidents in six months; intersection accounted for 14 percent of all traffic fatalities in the city]; *Bane* [*v. State of California* (1989)] 208 Cal.App.3d [860,] 872-873 [256 Cal.Rptr. 468] [intersection averaged twice as many accidents as similar intersections in the state; in the previous 18 months, 47 accidents resulted in five deaths and 89 injuries].)" (79 Cal.App.4th at pp. 737-738, italics added.) The court referred to the site of Alvarez's accident, with its seven prior cross-median accidents as having an "unremarkable accident history at the site," in view of the fact that the State's accident warrants had not been met. (*Id.* at p. 738.)

Based on the foregoing, we conclude that plaintiff has failed to establish changed circumstances justifying an exception to the immunity provided by Government Code section 830.6.

## DISPOSITION

The judgment is affirmed.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 12, 2001.