Filed 3/10/26  Orozco v. Dept. of Transportation CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RENALDO OROZCO et al., | B334870 |
| Plaintiffs and Appellants, | Los Angeles County |
| v. | Super. Ct. No. 20STCV47389 |
| DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa R. Jaskol, Judge.  Affirmed.

First Law Group, Eric A. Forstrom and Z. Dean Hakkak for Plaintiffs and Appellants.

Holbrook, Montoya, Berkebile, Erin E. Holbrook, Eric D. Weisel, Jerald M. Montoya and Germaine C. Ng for Defendant and Respondent.

———————————

Benjamin Orozco lost control of his van while driving on a freeway onramp.  The van left the roadway and went down an embankment, striking and killing Flor De Maria Lopez Carcamo.  Carcamo's family members sued the Department of Transportation (Caltrans), alleging it created a dangerous condition of public property.  Caltrans moved for summary judgment on the grounds that it is entitled to design immunity.  The trial court agreed and granted the motion.  On appeal, the plaintiffs contend the trial court erred because Caltrans failed to submit substantial evidence showing the onramp design was reasonable.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Background*

In the late morning of November 20, 2019, Benjamin Orozco drove his Chevy Express van onto the westbound State Route 118 onramp from San Fernando road.  It had been raining that day, and the pavement was wet.  Orozco lost control of the van and it started to "zig-zag" on the road.  The van slid off the right side of the road, traveled down an embankment, and crashed into a tree near an encampment of unhoused people.  The van rolled onto its side, pinning and killing Carcamo.

2. *The complaint*

Carcamo's family members—Renaldo Orozco, Rosalia Del Carmen Orozco, Sheiffer Melissa Palacios Lopez, and Brandon Ali Palacios Lopez—filed a lawsuit against Caltrans and several other defendants.  The operative second amended complaint asserted a single cause of action against Caltrans for creating a dangerous condition of public property in violation

2

of Government Code section 835.[1]  According to the complaint, the onramp constituted a dangerous condition because it did not have adequate guardrails and fencing, the road lacked safeguards to prevent or remedy wet conditions, the public entities failed to manage or remove an encampment in the area, and the roadway had inadequate signage.

3.	*Caltrans's motion for summary judgment*

Caltrans moved for summary judgment.  Caltrans argued it could establish the three elements required for design immunity under section 830.6:  (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design.

In support of its motion, Caltrans submitted a 24-page declaration from Christian Engelmann, who is a licensed civil and traffic engineer.  Engelmann worked at Caltrans from December 1999 until July 2016.  During that time, he was responsible for reviewing and approving construction project plans and was involved with Caltrans's highway design, review, and approval process.

To form his opinions, Engelmann reviewed the operative complaint, a traffic collision report, photographs taken during the collision investigation, project plans related to the onramp, and Caltrans's design manuals.  He also personally visited the onramp in May 2022.

According to Engelmann, the onramp begins as two lanes and transitions to a single lane before merging with the freeway

---

[1]	Undesignated statutory references are to the Government Code.

3

traffic. The alignment consists of two curves reversing upon each other, which are connected by a straight section of roadway. Orozco's van left the road while driving on the straight section, where the roadway is 27 feet wide and drivers have a "clear view of the onramp and its alignment." Engelmann measured the embankment's slope to be approximately 2:1 at that point.

Engelmann explained that California law vests in Caltrans the full possession and control of state highways. Caltrans delegates that authority to its employees who are licensed civil engineers. Engineers have discretionary authority to approve project plans, and they use their engineering judgment to determine whether to do so. A Caltrans engineer's signature on project plans reflects the engineer concluded the project was "designed in conformity with the appropriate guidelines and procedures for roadway design in effect at the time of the design."

According to Engelmann, Caltrans has published a Highway Design Manual since 1970. Before then, it published a Planning Manual of Instructions (Planning Manual). These manuals "contain guidelines for engineers who design and operate transportation facilities." The manuals do not provide legal standards and are "not a substitute for engineering knowledge, experience, or judgment." They are intended to "provide a guide for the engineer to exercise sound judgment in applying standards, consistent with the project development philosophy."

Engelmann stated Caltrans constructed the onramp over the course of two projects completed in the 1970s. The first project—completed in 1971—created the embankment upon which the onramp would be constructed. The second project—completed in 1976—constructed the roadway itself. The plans

4

for the 1976 project include a drawing labeled "guard railing."[2] The drawing did not call for installation of a guardrail at the specific location where Orozco's van left the roadway. Two licensed civil engineers signed the plans for each project, and the projects were completed according to those plans.

Caltrans undertook three other projects in the general area of the onramp: a landscaping project in 1982, installation of a meter in 2000, and a resurfacing project in 2019. As part of the 2019 resurfacing project, Caltrans engineers inspected a section of the roadway that included the onramp. The engineers recommended guardrails be installed and updated as part of the project, but not at the specific location where Orozco's van left the roadway. A licensed civil engineer signed the plans for the resurfacing project.

Engelmann discussed in detail eight design elements of the onramp: the embankment, guardrail, lane width, shoulder width, profile, asphalt dike, drainage, and trees. Engelmann concluded each design element was reasonable at the time of design and continues to be reasonable today. With respect to the lack of a guardrail, Engelmann explained the "decision to install guardrail[s] is based on engineering judgment or an engineering study." He noted that, as part of the 1976 and 2019 projects, civil engineers exercised their discretionary authority and determined a guardrail was not required at the specific location where Orozco's van left the roadway. Engelmann opined those decisions were reasonable at the time and remain reasonable today.

---

[2] The drawing also bears the labels "striping," "concrete barrier," "pavement markers," and "guide markers."

### 4. *Plaintiffs' opposition*

Plaintiffs opposed Caltrans's motion, arguing the onramp constituted a dangerous condition and Caltrans failed to show design immunity. Plaintiffs asserted the onramp design was not reasonable, as Caltrans failed to comply with the criteria in its own manuals when it elected not to install a guardrail. Plaintiffs alternatively asserted there was a change in physical condition that caused the state to lose design immunity. According to Plaintiffs, Caltrans failed to prevent, manage, or remove an encampment at the bottom of the onramp embankment. In passing, Plaintiffs also argued there are triable issues on whether the repaved surface was able to handle moisture and drainage properly.

Plaintiffs filed an expert declaration from Edward Ruzak. Ruzak is a civil engineer and worked at Caltrans for a few years in the 1960s. Since then, he has primarily worked as an engineering consultant. Ruzak opined the lack of a guardrail "for the onramp constituted a dangerous condition at the time of the accident."

Ruzak criticized Engelmann for failing to analyze the sections of Caltrans's design manuals that concern guardrails. He noted that section 7-702 of the 1964 version of the Planning Manual states, " '[T]he need for a guard rail is generally determined by considering the following factors: (a) height of embankment; (b) alignment; (c) roadbed width; (d) accident history; (e) speed and volume of traffic; (f) visibility; and (g) climatic conditions.' " It continues, " '[O]n curves requiring a reduction in approach speeds of the faster group of drivers, any one of the following conditions indicate that consideration should be given to the installation of a guard rail on the outside

6

of the curves: (a) Height of embankment more than 10 feet[;] (b) Side slope steeper than 4:1[;] (c) Shoulder width less than 8 feet.['] " Ruzak asserted, based on his own field observations, the height of the embankment is between 15 and 25 feet, the slope is between 2:1 and 1.5:1, and the ramp shoulder is only 4.4 feet wide. He also noted the onramp has significant traffic, it transitions from two lanes to one, drivers must slow down due to the reverse curve design, and "[c]limatic conditions include rain."

Ruzak also discussed the 2012 version of Caltrans's "Traffic Manual." The manual states, whether to install a guardrail to shield an embankment slope is " 'largely a result of analyzing the [relevant criteria] and determining whether a vehicle hitting a guard rail is more severe than going over the embankment slope.' " Ruzak explained that, based on a graph included in the manual, going over the onramp's embankment slope is considered more severe than hitting a guardrail.

Ruzak concluded, based on his observations and the relevant sections of Caltrans's design manuals, "Caltrans clearly failed to properly analyze the need for a guard rail proximate to the crash site, nor did its expert, Mr. Engelmann. Indeed, Caltrans failed to follow its own 'Planning Manual' criteria. Consequently, many of the design elements are unreasonable and contributed to creating a dangerous condition." Ruzak asserted Caltrans "failed to conduct the requisite investigation (prior to the crash) into whether the roadway was safe for travel. [Caltrans] also failed to install a guardrail (or provide satisfactory evidence of its consideration and reasonable rejection). In short, [Caltrans] failed to satisfy applicable engineering standards."

7

**5.    *The order and judgment***

The trial court granted Caltrans's motion for summary judgment.  The court concluded Caltrans met its burden to show all the elements of design immunity.  On the reasonableness element, the court pointed to Engelmann's opinion that the design was reasonable as well as evidence showing Caltrans engineers used their discretionary authority to approve the plans for the onramp.  The court rejected Plaintiffs' argument concerning a change in condition, explaining they failed to explain how the presence of unhoused people and the resurfacing constituted sufficiently changed conditions.

The court entered judgment for Caltrans.  Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs argue the trial court erred by granting Caltrans's motion for summary judgment.  They contend Caltrans created a dangerous condition by not installing a guardrail at the specific location where Orozco's van left the roadway.  Plaintiffs assert Caltrans failed to establish design immunity because it did not submit substantial evidence showing the reasonableness of its design.

The Government Claims Act provides a public entity is liable for an injury to a person only to the extent provided by statute.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)  Under section 835, subdivision (b), a public entity is liable "for injury proximately caused by a dangerous condition of its property if the dangerous condition created a reasonably foreseeable risk of the kind of injury sustained, and the public entity had actual or constructive notice of the condition a sufficient time before the injury to have taken preventive

8

measures." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 68 (*Cornette*).)

A public entity may avoid liability for an injury caused by a dangerous condition by raising the affirmative defense of design immunity. (See § 830.6.) "A public entity claiming design immunity must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette, supra*, 26 Cal.4th at p. 66.) Plaintiffs concede that Caltrans established the first two elements of design immunity; they challenge only the third element. The third element "is a matter for the courts, not the jury, to decide." (*Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 653.)

" 'The normal rules governing a motion for summary judgment, and requiring its denial if any triable issue of fact appears, are not fully applicable [to cases involving design immunity under Government Code section 830.6]. For example, the defendant is not required to prove to the court that the design or plan was in fact a reasonable one. Instead, the defendant is merely required to adduce any "substantial evidence" that a reasonable public employee or legislative body could have approved the plan or design used under [Government Code section] 830.6. Thus, when the defendant files a motion for summary judgment, the existence of a possible conflict of evidence, as shown by the proof submitted on the motion, will not create a triable issue on this aspect of the defense that can defeat a summary judgment . . . .' [Citation.] 'We are not concerned with whether the evidence of reasonableness is

undisputed; the statute provides immunity when there is substantial evidence of reasonableness, even if contradicted. [Citations.]' " (*Wyckoff v. State of California* (2001) 90 Cal.App.4th 45, 50–51.)

" 'Any substantial evidence' to establish this third element of the immunity may consist of the following: Discretionary approval of the design plans themselves [citation]; the expert opinion of a civil engineer as to the reasonableness of the design [citation]; or evidence the design or plan complies with prevailing professional standards [citation]. 'A mere conflict in the testimony of expert witnesses provides no justification for the matter to go to a lay jury who will then second-guess the judgment of skilled public officials. [Citation.]' " (*Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 21 (*Menges*); see *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 941 (*Grenier*).) The public entity need not show the actual decision makers acted reasonably or that substantial evidence of reasonableness was before them at the time. (*Tansavatdi v. City of Rancho Palos Verdes* (2021) 60 Cal.App.5th 423, 440 (*Tansavatdi*).)

Caltrans met its burden here. It presented evidence showing two licensed civil engineers approved the original construction plans for the onramp in the 1970s, and another licensed civil engineer approved plans for a resurfacing project in 2019. According to Caltrans's expert, the engineers' approvals signify their determinations that the plans met applicable design standards and procedures. There is no direct evidence that the engineers considered installing a guardrail at the specific location where Orozco's van left the roadway. However, the plans for both projects referred to guardrails. The resurfacing project,

10

in particular, called for installing and upgrading guardrails at and near the onramp.  Therefore, it is reasonable to infer the engineers considered installing guardrails at other locations within the projects' scopes—including the location where Orozco's van left the roadway—but determined it was not necessary. (See *Tansavatdi, supra*, 60 Cal.App.5th at p. 440 [evidence that the engineer who approved plans considered the challenged design element supports the reasonableness of the design].)

Caltrans also presented an expert declaration from Engelmann, who is a licensed civil engineer with decades of experience.  Engelmann discussed eight design elements of the onramp, one of which was the absence of a guardrail where Orozco's van left the roadway.  Engelmann opined each of those design elements was reasonable at the time Caltrans approved it and remains reasonable today.  Engelmann's opinion, along with the evidence of discretionary approval by three licensed civil engineers, constitutes substantial evidence supporting the reasonableness of the design.  (See *Menges, supra*, 59 Cal.App.5th at p. 21 [evidence of civil engineer's approval of relevant design plans alone was sufficient to establish the third element of design immunity]; *Grenier, supra*, 57 Cal.App.4th at pp. 936, 941 [evidence that a city engineer approved plans drafted by a civil engineer satisfied the reasonableness requirement]; see also *Gonzales v. City of Atwater* (2016) 6 Cal.App.5th 929, 953 [" 'approval by competent professionals can, in and of itself, establish the reasonableness element' "]; *Stufkosky v. Department of Transportation* (2023) 97 Cal.App.5th 492, 500 [generally, " 'a civil engineer's opinion regarding reasonableness is substantial evidence sufficient to satisfy' " the reasonableness

11

element of design immunity]; *Tansavatdi*, *supra*, 60 Cal.App.5th at pp. 438–439 [same].)

Plaintiffs acknowledge that the type of evidence Caltrans submitted—discretionary approval by licensed engineers and expert opinion—may constitute substantial evidence of reasonableness in some circumstances. However, they argue it was not sufficient here because the design did not comply with Caltrans's own standards. Specifically, they contend the lack of a guardrail is inconsistent with section 7-702 of the 1964 version of the Planning Manual, which lists the factors relevant to the decision to install a guardrail. Plaintiffs suggest their expert's analysis of those factors demonstrates that the Planning Manual required installation of a guardrail next to the embankment. We disagree.

Although Plaintiffs' expert suggested some of the section 7-702 factors weighed in favor of a guardrail, he did not go so far as to assert they *required* one.[3] Nor did Plaintiffs' expert address the section 7-702 factors that weighed in favor of Caltrans's design. Caltrans presented undisputed evidence showing Orozco's van left the roadway at a tangent (i.e. straight) section of the onramp, the roadway width is 27 feet at that location, drivers have a "clear view of the onramp and its alignment," and the onramp sufficiently drains rain water. Section 7-702 does not mandate how an engineer must weigh the relevant factors. Therefore, the fact that some factors weighed against

_____

[3]     Tellingly, Plaintiffs' expert never explicitly stated Caltrans's decision not to install a guardrail next to the embankment was unreasonable. He vaguely stated "many of the design elements are unreasonable," but he did not specifically identify the guardrail as one of those elements.

12

Caltrans's decision does not show the design violated Caltrans's standards or otherwise was unreasonable.

Nor are we persuaded by Plaintiffs' contention that Caltrans failed to meet its burden because it presented no evidence that the engineers considered section 7-702 before approving the plans. Although there is no direct evidence that the Caltrans engineers weighed the section 7-702 factors, it is reasonable to infer they did. According to Engelmann, the engineers' signatures on the design plans reflect a determination that the plans comply with the relevant standards. Therefore, to the extent section 7-702 reflected an engineering standard at the time,[4] the engineers' signatures themselves support an inference that they considered those factors when deciding whether to install a guardrail. That inference is significantly strengthened by the fact that the relevance of the section 7-702 factors is a matter of common sense. Indeed, it is obvious— even to a non-engineer—that the need for a guardrail to shield an embankment depends on the traffic and weather conditions, width and alignment of the roadway, visibility, accident history, and embankment height. Therefore, it is difficult to fathom how the engineers could not have considered those factors when deciding whether to install a guardrail next to the embankment.[5]

---

[4]  Caltrans notes that the section 7-702 factors upon which Plaintiffs rely come from a version of the Planning Manual that was no longer in effect when the engineers approved the construction plans. We will assume, for the sake of argument, that the same factors also appeared in the version of the Planning Manual that was in effect at the relevant times.

[5]  We do not mean to suggest the decision to install a guardrail is a matter of common sense, only that the relevance

13

We also reject Plaintiffs' contention that Engelmann's failure to address the section 7-702 factors is "fatal" to his opinion. Although Engelmann did not cite section 7-702 in his declaration, he was aware of most of the relevant factors. Engelmann visited the onramp in person, allowing him to measure and observe firsthand the traffic conditions, driver visibility, roadway alignment, embankment height, and roadway width. It also is reasonable to infer Engelmann is familiar with the general weather conditions in Southern California.[6] As we noted above, the relevance of the section 7-702 factors to the guardrail issue is generally a matter of common sense. Therefore, although Engelmann did not explicitly refer to section 7-702 in his declaration, it is reasonable to infer he considered the relevant factors while forming his opinion. His failure explicitly to discuss those factors affects the weight of his opinion, but it does not render it entirely worthless, as Plaintiffs suggest.

Nor is there merit to Plaintiffs' suggestion that a guardrail was required because the embankment is more than 10 feet tall, the slope is steeper than 4:1, and the shoulder width is less than eight feet. In support, Plaintiffs rely on provisions in section

---

of the section 7-702 factors is obvious. Precisely how to weigh those factors requires expertise and is a matter beyond common sense.

[6] The only section 7-702 factor Engelmann potentially did not have access to was the onramp's accident history. However, there is nothing in the record to suggest there was a high collision rate at the onramp or any other incidents in which a vehicle left the roadway. Plaintiffs do not argue otherwise.

7-702 that apply to the outside of "curves requiring a reduction in approach speeds of the faster group of drivers." Caltrans presented undisputed evidence showing Orozco was not driving on a curved section of the onramp when his van left the roadway. Therefore, Plaintiffs' reliance on those provisions is irrelevant. The same is true of Plaintiffs' reliance on a provision stating "consideration should be given to the installation of a guard rail if there is a concentration of running off the roadway accidents or if unusually high embankments or steep terrain give motorists a feeling of insecurity." There is nothing in the record even to suggest either applies here.

We also reject Plaintiffs' contention that the onramp design is inconsistent with section 7-03 of the 2012 Traffic Manual. Section 7-03.3 lists factors that "may be used as a guide" when considering the installation of a guardrail: collision history, alignment, volume and speed of traffic, merge and weave areas, climate, and roadside recovery area. Section 7-03.4 states the decision to install a guardrail "to shield embankment slopes is largely a result of analyzing [those factors] on a case by case basis and determining whether a vehicle hitting [a] guardrail is more severe than going over an embankment slope." The Traffic Manual includes an "equal severity curve" graph that shows, for a given embankment height and slope, whether striking a guardrail would be more or less severe than going over the embankment. Plaintiffs note that, applying Ruzak's measurements to the equal severity curve, it would be less severe to strike a guardrail at the location where Orozco's van left the roadway than it would be to go over the embankment.

At the outset, the equal severity curve in the 2012 Traffic Manual did not exist in the 1970s, when Caltrans approved the

15

original onramp design.[7]  Although it appears a different version of the curve existed at that time, Plaintiffs did not include it in the record.  Therefore, we do not know whether that version of the curve would have weighed in favor of a guardrail.  In any event, the equal severity curve is not the determining factor when deciding whether to install a guardrail.  Instead, the Traffic Manual states it is one factor among many that an engineer should consider.  As we discussed above, the record contains evidence showing some of those factors support Caltrans's decision not to install a guardrail.  The fact that the equal severity curve might support the opposite conclusion does not invalidate that evidence.  Nor does it invalidate Caltrans's evidence showing four licensed civil engineers determined—explicitly or implicitly—a guardrail is not required.

Finally, we reject Plaintiffs' passing argument that Caltrans lost its immunity because of a change in physical condition.  A public entity loses its design immunity if the plaintiff establishes three elements:  "(1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings." (*Cornette, supra,* 26 Cal.4th at p. 72.)

---

[7]     The Traffic Manual states the severity curve was developed in the 1960s, was updated in the early 1980s, and is "still applicable" in 2012.

Plaintiffs contend the "development and presence of a homeless encampment around the subject roadway" and the 2019 roadway resurfacing constitute changed conditions for purposes of design immunity. Plaintiffs do not provide relevant authority or reasoned analysis explaining how either constitutes a sufficient change in physical condition. Nor do they address the other two elements required to show Caltrans lost its design immunity. Accordingly, they have not met their burden to show the trial court erred. (See *Mirzada v. Department of Transportation* (2003) 111 Cal.App.4th 802, 806–807 ["plaintiffs needed to make a prima facie showing of the existence of a triable issue of fact with respect to each" element of the loss of design immunity]; *Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564 [" 'error must be affirmatively shown' "].)

## DISPOSITION

We affirm the judgment and award Caltrans its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.