Filed 2/25/16  Gone v. Santa Clara Valley Transportation Authority CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PRANEETH GONE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SANTA CLARA VALLEY<br>TRANSPORTATION AUTHORITY,<br><br>    Defendant and Respondent. | H039234<br>(Santa Clara County<br>Super. Ct. No. 110CV173570) |

Plaintiff and appellant Praneeth Gone (Plaintiff) sued defendant and respondent Santa Clara Valley Transportation Authority (VTA) for injuries suffered after being struck by a VTA light rail train.  Plaintiff asserted two causes of action:  negligence and dangerous condition of public property.  Plaintiff's negligence claim was based on several theories.  He alleged:  (1) VTA negligently "managed, maintained, . . . , repaired, manufactured and designed" the subject light rail train; (2) VTA "negligently hired, trained, and/or supervised" its agents and employees; and (3) VTA's employee negligently operated the train.

VTA moved for summary adjudication of both causes of action.  (Code Civ. Proc., § 437c, subd. (f); all further undesignated statutory references are to the Code of Civil Procedure.)  VTA argued there were no triable issues of material fact as to any of the alleged negligent acts because VTA had not breached any duty of care it owed Plaintiff,

and the accident was due to Plaintiff's sole negligence as a matter of law. VTA also argued the dangerous condition of public property claim failed because there was no dangerous condition and, in any event, it was entitled to design immunity under Government Code section 830.6. The court granted summary adjudication of both causes of action and, hence, summary judgment

We will reverse the grant of summary judgment. We conclude there are triable issues of material fact regarding the speed limit at the location where the accident occurred and the train's speed at the time of the collision that preclude summary adjudication of the negligence cause of action. With respect to the cause of action for dangerous condition of public property, we conclude VTA was entitled to summary adjudication on its design immunity defense, which is a complete defense to that cause of action. We will therefore reverse the summary judgment and direct the trial court to enter a new order denying summary adjudication of the negligence cause of action and granting summary adjudication of the design immunity defense.

## FACTS

On June 26, 2009, at approximately 3:40 p.m., Plaintiff disembarked from a southbound VTA light rail train at the Fruitdale station in San José and walked to the at-grade pedestrian crossing at the southern end of the platform ("Pedestrian Crossing" or "Crossing"). Plaintiff opened one of the metal gates that separated the Crossing from the platform and stepped onto the Crossing when a northbound train was entering the station. Plaintiff took a few steps forward, looked to his right, saw the on-coming train, and froze. Instead of continuing forward, out of the path of the train, Plaintiff turned to his right and faced the on-coming train. He continued to turn to his right, back toward the station platform. Plaintiff was struck in the left shoulder by the left front headlight of the train.

Plaintiff has no memory of the accident or the events that led to it. Our description of the accident is based on (1) images from a video camera on the light rail

2

train that struck Plaintiff, (2) the deposition testimony of the train operator, and (3) the declaration of an eyewitness.

## I. Description of the Fruitdale Station and Pedestrian Crossing

The Fruitdale station consists of a concrete platform that is several inches above grade. There are two sets of light rail tracks—one on each side of the platform—that run parallel to Southwest Expressway and travel along a southwest to northeast line. We shall refer to the light rail trains that run through this station as "northbound" and "southbound" trains, since that is how they are described in the record. The light rail tracks are parallel to a third set of tracks that belongs to the Union Pacific Railroad.

The Fruitdale station (including the railroad tracks) is bound by a sound wall on the northwest side and a cyclone fence on the southeast side. Passengers access the station platform from two pedestrian crossings: (1) one at the northern end of the platform, which is part of the sidewalk at the intersection of Fruitdale Avenue and Southwest Expressway; and (2) the Pedestrian Crossing at the southern end of the platform.

The Pedestrian Crossing is a concrete walkway at the southern end of the platform, which crosses the northbound light rail tracks and the Union Pacific tracks, but not the southbound light rail tracks. There are metal gates at each end of the Crossing. A first set of three gates is on the platform. A second set of three gates is in the cyclone fence that separates the station and the tracks from the sidewalk on the station side of Southwest Expressway. The gates on the platform open inward. Pedestrians pull the gates toward themselves before entering the Crossing. The walkway surface adjacent to the gates is covered with yellow "ADA[1] tactile warning strips."

---

[1] ADA refers to the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.).

The light rail trains are electric and "very quiet."  Audible bells and flashing lights on the platform and at the Pedestrian Crossing alert passengers that a train is coming. The south end of the platform and the Crossing had:  (1) two white signs with the word "Look" in black letters under a two-way arrow (↔); (2) three sets of flashing lights and audible bells; (3) two white, X-shaped sign with the words "Railroad Crossing" written in black letters; and (4) two yellow signs with the words "No Train Horn."

When facing south, looking toward the end of the platform, passengers can see one set of lights, a "Railroad Crossing" sign, and the northbound tracks.  When standing at the gates where Plaintiff stood before he stepped onto the Crossing, passengers can see one of the "Look" signs with the double arrows, a set of flashing lights, one of the "Railroad Crossing" signs, and a "No Train Horn" sign.

The flashing lights and bells are activated only by northbound trains, since the southbound tracks do not intersect with the Crossing.  The activation circuit is 1693 feet (approximately one third of a mile) south of the Crossing.  The lights and bells are activated 28 seconds before the train arrives.  Plaintiff testified that prior to the accident, he thought the lights flashed for both northbound and southbound trains and that if there was more than one train in the station, it was confusing which lights were for which train.

At the time of the accident, Plaintiff was on his way home.  He lived in an apartment on Southwest Expressway, across the street from the Pedestrian Crossing. Plaintiff had lived there for approximately six weeks before the accident and rode the light rail every day.  Most of the time, Plaintiff used the northern pedestrian crossing. But about 20 percent of the time, he used the southern Pedestrian Crossing, which provided the shortest route from the Fruitdale station to his apartment.  Plaintiff estimated he used the Crossing five to 10 times prior to the accident.

4

## II. Deposition Testimony of Train Operator Luna

The light rail train operator, Jess Luna, testified that the train had left the Bascom station and was headed northbound, entering the Fruitdale station when the accident occurred. The two stations are approximately one mile apart and the speed limit between them is 55 miles per hour, the "normal operating speed." It generally takes two minutes to travel between the stations.

The controller for the light rail train has six "Power" settings (which are used to accelerate), a "Coast" setting, and six "Brake" settings, which are labeled "B1" through "B5" and "MB" (for maximum braking). Luna said that once he reaches the desired speed, he places the controller in "Coast," which is between the power and brake settings. Luna generally moves the controller gradually from "Coast" to B1, B2, and B3 to bring the train to a stop. The train decelerates more quickly as the brake settings increase. In the normal course of events, Luna does not need to use the higher brake settings to stop the train. Luna generally starts to decelerate about a quarter mile before the Fruitdale station and moves the controller to B3 when he is about 100 feet from the station.

The speed limit at the station is 25 miles per hour if the operator is not going to stop at that station. According to Luna, if the operator intends to stop, the speed limit is 15 miles per hour when the train enters any portion of the station. At the time of the accident, Luna intended to stop at the Fruitdale station, since there were passengers waiting for his train.

On the date of the accident, there were no obstructions that interfered with Luna's view of the tracks or the station itself as he approached. Similarly, photos demonstrate there was nothing obstructing Plaintiff's view of the tracks as he walked toward the Crossing and when he stood at the gates. The weather was clear. Luna started to decelerate about one quarter mile from the station. He started braking gradually, moving the controller from B1 to B2 to B3. Luna testified that he moved the controller into the

5

B3 position approximately 40 feet south of the platform. He later stated the controller was in the B3 position one eighth of a mile (660 feet) from the station. As he approached the station, Luna was aware that pedestrians could open the gate and walk onto the Crossing.

The Fruitdale station is a "no horn area" because there are residences nearby. Luna is more cautious when entering a no horn area: he comes into the station at 15 miles per hour, watches pedestrians more closely, and is more aware of his surroundings. Normally, Luna does not use the train's horn as he approaches the Fruitdale station.

Luna first saw Plaintiff on the platform, walking toward the Crossing. Luna understood Plaintiff would eventually use the Crossing because that is the only exit at that end of the station. Luna estimated his train was one eighth of a mile from the station at that point; the controller was in the B3 position; and his speed was 25 mile per hour. When Luna next saw Plaintiff, he was standing at the gates on the platform side of the Crossing. The warning bells and lights at the Crossing had been activated.

Luna then saw Plaintiff open a gate and step onto the Crossing. Luna testified he was going 15 miles per hour when Plaintiff swung the gate open. He put the controller in "MB" maximum braking mode and sounded his high horn (the loudest warning device on the train) at the same time. The controller was already in the B3 position and Luna estimated it took him less than a second to activate maximum braking and the horn. There were one or two seconds between the time Luna hit his horn and the impact with Plaintiff. Luna estimated the train's speed was less than 15 miles per hour at the time of impact.

The on-board video camera on Luna's train recorded the accident. Neither party submitted the recording to the court for review, but VTA's evidence included 12 "video snapshots" from the video camera with date and time information on each photo.

6

### III. Declarations of Eyewitness, Expert Witnesses, and Other Evidence

VTA's evidence in support of the motion included a declaration from Antonio Badillo, who was waiting on the platform for the northbound train when the accident occurred. According to Badillo, Plaintiff stepped onto the Crossing in front of the on-coming train. Badillo yelled at Plaintiff "to watch out, . . . a train [is] coming." Badillo heard others yelling at Plaintiff, too. Badillo heard the warning "bells dinging" and saw the warning lights flashing. He questioned why Plaintiff did not see the train because "[t]he train was almost on top of him when he walked out onto the track." According to Badillo, the train slowed down and the operator blew its horn.

VTA presented evidence that (1) between the date the Fruitdale station opened (October 1, 2005) and the date of the accident (June 26, 2009), light rail trains made at least 143,272 trips through the Fruitdale station; and (2) between July 1, 2006, and the date of the accident, 375,000 passengers used the Fruitdale station. That is an average of 343.7 persons per day. Since the station opened, there have been no other reported incidents at the Crossing.

VTA submitted the declaration of Stephen Werner, a mechanical engineer and accident reconstruction expert. Werner opined that any reasonably attentive person at the Crossing would have been made aware of the northbound train by the flashing lights and the bells and "simply by looking southbound . . . before walking onto the right-of-way." Werner further opined that the train was approximately 135 feet from the Crossing when Plaintiff walked onto the Crossing, and the train was traveling no more than 30 miles per hour when Luna "went into maximum braking." Werner also opined that if Plaintiff had not frozen and turned back toward the platform, he would have had sufficient time to clear the tracks and avoid being hit by the train.

7

In opposition to the motion, Plaintiff relied on the declarations of two experts (David Rondinone and John Glennon), which we summarize in the Discussion portion of this opinion.

## IV. Plaintiff's Injuries

Transit Patrol officers found Plaintiff on the ground between the train and the platform. Plaintiff had blood around his mouth and bruising on both sides; the left side of Plaintiff's face was swollen and he complained of abdominal pain. An emergency room physician reported that Plaintiff had sustained a skull fracture, with brain injury, but the extent of Plaintiff's injuries would not be known until further testing had been completed. There is no other evidence regarding Plaintiff's injuries in the record.

## V. VTA's Employment and Training of Luna

When VTA first employed Luna, he was required to undergo a background check, which included fingerprinting, disclosure of arrests and convictions, and a review of Luna's DMV record. Luna "successfully cleared the entire process."

Luna worked for VTA as a bus driver before becoming a light rail operator in 2001. Upon becoming a light rail operator, Luna completed two to three months of training (40 hours per week), which included classroom instruction and field training. Luna worked as a light rail operator until July 2002; at that time, due to layoffs at VTA, Luna returned to bus driving. When the Mountain View-Winchester line opened in 2005, Luna returned to light rail train operation. He has held this job continuously since 2005.

When Luna returned to train operation in 2005, he received an additional month of training. Because of the addition of new light rail lines, the rules and procedures had changed, but the operation of the light rail trains remained the same. Luna also received annual recertification training (16 hours over 2 days) and completed Safety Procedures and Rules Adherence Testing in January 2009. Light rail operators are trained on five

8

defensive driving techniques: (1) aim high while operating, (2) view the total traffic picture, (3) keep your eyes scanning, (4) leave yourself an out, and (5) make sure others see you. On August 22, 2006, all light rail employees received a memorandum from the transportation superintendent regarding the proper use of audible warnings.

Light rail operators are supervised by two rail control supervisors who track rail operations by radio in the Operations Control Center. VTA operators also report to the VTA dispatcher at the start of each shift and at other points during the day. In addition, there are three to five field supervisors on duty at all times.

VTA regularly performs unannounced "ride checks" of light rail operators, during which time staff ride the train and evaluate the operator's performance. "Ride checks" are done without the knowledge of the operator; the ride check evaluators reveal themselves only after the ride check has been completed. Luna received 37 ride checks in eight years, which exceeded the standard of three ride checks per year. Whenever there is a rule violation or operational deficiency, VTA policy requires the operator to undergo customized, focused retraining. Luna was never charged with a rule violation or operational deficiency and has never been required to undergo retraining.

Luna met all testing and training requirements and did not have any safety violations prior to the accident. There were no prior incidents in which a train Luna was operating collided with another vehicle or a pedestrian. Luna estimated he had driven the route where the incident occurred 150 times before the accident involving Plaintiff.

Plaintiff's evidence included Luna's deposition testimony that prior to the accident, Luna had not received any training on specific precautions to be taken when approaching the Pedestrian Crossing at the Fruitdale station. Luna also testified there are four other stations on the Mountain View-Winchester line that have the same type of pedestrian crossing as the Fruitdale station.

## VI. Dangerous Condition of Public Property and Design Immunity

VTA's evidence in support of its motion for summary adjudication of the dangerous condition of public property claim included a declaration from Mark Robinson, VTA's Chief Engineering and Construction Officer. Robinson was the project manager for the construction of the Vasona Light Rail Project, which included the Fruitdale station and the Crossing. Robinson declared that the design of the Crossing was presented to the California Public Utilities Commission (CPUC) for approval in May 2001 and approved on November 29, 2001. Attached to Robinson's declaration was a copy of the unpublished CPUC decision and order approving the construction of the Crossing and two other crossings in the Vasona Light Rail Project (*Santa Clara Valley Transportation Authority* (2001) Cal. P.U.C. Dec. No. 01-11-057 [2001 Cal. PUC Lexis 1035] (hereafter CPUC Decision)).

The CPUC Decision approved the following warning devices at the Crossing: (1) the look-both-ways signs, (2) placement of the ADA tactile warning strips, "with a swing gate outside of the freight tracks," and (3) three sets of pedestrian flashers. Robinson declared that the CPUC's design plan approval was adopted by VTA and that all pedestrian warning devices called for in the CPUC order were installed as approved. According to Robinson, VTA inspected the warning devices before and after the accident (on June 22 and June 29, 2009) and found them to be operational.

### PROCEDURAL HISTORY

### I. Pleadings

On June 3, 2010, Plaintiff filed a complaint for personal injuries in the superior court. The complaint contained two causes of action: negligence and dangerous condition of public property. The complaint alleged that (1) VTA's employees negligently operated the train that struck Plaintiff; (2) VTA's employees negligently

10

"entrusted, managed, maintained, drove, operated, repaired, manufactured, and designed" the train; and (3) VTA negligently hired, trained and supervised its employees in such a fashion as to cause or contribute to Plaintiff's injuries.

VTA answered the complaint in July 2010. VTA's affirmative defenses included Plaintiff's comparative negligence and design immunity.

## II. *Motion for Summary Judgment*

VTA filed a motion for summary judgment or for summary adjudication of each causes of action. VTA argued that Plaintiff could not state a cause of action based on negligent operation of the train because there were no triable issues of fact on the question whether Luna had beached a duty of care to Plaintiff. VTA asserted that it was undisputed that Luna had no opportunity to stop the train in time to avoid the accident. It also argued that Plaintiff breached his own duty of care and was the sole cause of his injuries as a matter of law. VTA contended: (1) Luna had every right to assume Plaintiff would heed the warning signals and stop at the gate; (2) Plaintiff had a duty to use his senses to determine whether a train was coming before stepping onto the tracks, and (3) Plaintiff breached his duty of care by violating Vehicle Code section 22451, subdivision (a), which required Plaintiff to stop at the crossing because warning lights were flashing and the train was "plainly visible."

As for the negligent hiring, training, and supervision claim, VTA argued that Plaintiff could not demonstrate a breach of a duty of care under this theory because there were no facts that warned VTA that Luna presented an unreasonable risk of harm to third persons as a train operator. VTA argued that based on its stringent hiring, training, and supervision practices, and the undisputed fact that VTA had complied with those practices with regard to Luna, Plaintiff could not establish negligence based on this theory. As for the alleged negligent repair or maintenance claim, VTA argued that

11

Plaintiff had not developed any facts that indicated the condition of the train had anything to do with the accident.

VTA attacked Plaintiff's dangerous condition of public property claim on two grounds. First, it argued that Plaintiff could not establish there was a dangerous condition at the Crossing. VTA asserted that a public entity is only required to make its property safe for reasonably foreseeable careful use and that Plaintiff did not use the Crossing with due care. Second, VTA argued that the dangerous condition claim was barred by the government design immunity defense. VTA asserted that the absence of additional warnings and locking gates at the Crossing were design decisions that were approved by the CPUC and by VTA, and design immunity therefore applies.

### III.    *Opposition to Motion for Summary Judgment*

Plaintiff opposed the motion for summary judgment. Plaintiff's papers in opposition to the motion included a separate statement that asserted 89 new undisputed facts and raised objections to VTA's evidence.

Based on the declaration of VTA's expert (Werner), in which Werner opined the train was travelling no more than 30 miles per hour when Luna hit maximum braking, Plaintiff argued that Luna violated CPUC General Order 143-B, section 7.05, which limits rail speeds in pedestrian walkways to no more than 20 miles per hour. He also argued that General Order 143-B and the operating rules of the VTA mandated a substantially slower speed. And he argued that the accident could have been avoided if the train had been traveling 20 miles per hour or even 28 miles per hour.

Plaintiff also argued that Vehicle Code section 22451 does not apply to the Crossing and that VTA improperly relied on railway liability cases that were decided before California adopted comparative negligence rules. He also argued that Luna was responsible for the safe operation of the train and that he failed to follow VTA rules that

12

required him to (1) decrease his speed and stop for pedestrians, (2) follow the "Basic Speed Rule," and (3) stop within one half the distance of any obstacle.

With regard to the dangerous condition of public property claim, Plaintiff argued that VTA's statistics were misleading since VTA had not presented any evidence of how many passengers used the Crossing, as opposed to the station. He also argued that design immunity does not apply because there was no evidence the CPUC engaged in an informed exercise of discretion regarding: (1) the failure to install gates at the Crossing that automatically lock when a train approaches, and (2) placement of the Crossing at a location that leads nowhere and requires pedestrians to jaywalk. Plaintiff contended that VTA's showing was deficient because it had not submitted any plans, drawings or specifications related to its design considerations or the as-built plans. Finally, Plaintiff argued that the declarations of his experts created triable issues regarding the reasonableness of VTA's design and that VTA's evidence was insufficient to support its design immunity defense.

### IV. VTA's Reply

In reply, VTA's submitted additional evidence relating to its design immunity defense, including (1) the application it had filed with the CPUC for approval of the Crossing, and (2) the as-built plans for the Crossing.

### V. Order on Motion for Summary Judgment

The court granted summary adjudication of both causes of action and, hence, summary judgment. In its order, the court separated Plaintiff's several negligence theories into the same three groups VTA used in its motion and explained why VTA had prevailed on each theory. Regarding the alleged negligent manufacture and design claim, the court treated the motion for summary judgment as a motion for judgment on the pleadings and concluded that Plaintiff had not sufficiently stated such a claim. The court

13

added, "Plaintiff seemingly concedes there is no evidence in support of negligent manufacture/design of the train."

As for the dangerous condition of public property claim, the court concluded that VTA had met its initial burden of showing the property was not dangerous and that Plaintiff had not submitted any evidence that created a triable issue of fact on that point. In light of its conclusion, the court did not reach VTA's design immunity defense.

DISCUSSION

## I. Standard of Review

We review an order granting summary judgment de novo. (*Lonicki v. Sutter Health* (2008) 43 Cal.4th 201, 206 (*Lonicki*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) The trial court's ruling on a motion for summary adjudication, like that on a motion for summary judgment, is subject to this court's independent review. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) In determining whether summary judgment was proper, we analyze the propriety of granting summary adjudication with regard to each of Plaintiff's causes of action.

"In undertaking our independent review, we apply the same three-step analysis used by the trial court. First, we identify the issues framed by the pleadings. Second, we determine whether the moving party has established facts that justify judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858-859, citing *Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886-887.) Although we apply the same analysis as the trial court, we independently determine the construction and effect of the facts presented to the trial court as a matter of law.

14

(*Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1515; *Kasparian v. AvalonBay Communities* (2007) 156 Cal.App.4th 11, 24.)

In performing our review, we view the evidence in a light favorable to the losing party (Plaintiff), liberally construing that party's evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769.)

## II. General Rules Regarding Summary Judgment and Summary Adjudication

"A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (§ 437c, subd. (f)(1).) The statute thus authorizes motions for summary adjudication that "reduce the costs and length of litigation" by limiting the substantive areas of dispute. (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1852 (*Lilienthal*); see also, *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 97 (*Catalano*).)

Summary judgment motions serve a similar purpose, which is "to identify those cases in which there is no factual issue which warrants the time and cost of factfinding by trial." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 (*Martin*).) Thus, the object of both procedures is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Aguilar*, *supra*, 25 Cal.4th at p. 843.)

"A party can obtain summary judgment only by establishing the merit of his [or her] case 'as a matter of law.' (. . . § 437c, subd. (c).) The phrase 'as a matter of law' is another way of saying that the evidence available to the parties, and placed before the court in support of and in opposition to the motion, raises no material issue that a trier of

15

fact could resolve in favor of the party opposing the motion." (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 756 (*Cole*).)

Summary adjudication motions are "procedurally identical" to summary judgment motions. (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1290.) A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit or that there is no defense" thereto. (*Id.*, subd. (a).) A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (*Id.*, subds. (o), (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 849-850, 853-854.) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. (§ 437c, subd. (p)(2); see *Aguilar*, at p. 850.) The party moving for summary judgment "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he [or she] carries his [or her] burden of production, he [or she] causes a shift, and the opposing party is then subjected to a burden of production of his [or her] own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, at p. 850.)

### III. *Whether the Trial Court Could Summarily Adjudicate Each of Plaintiff's Negligence Theories Separately*

Although Plaintiff pleaded his negligence claim as a single cause of action, he relied on several different theories of negligence liability. VTA's motion divided the negligence claim into three groups that were based on related theories of liability: (1) VTA's vicarious liability for Luna's negligent operation of the train (negligent

16

operation); (2) VTA's direct liability for negligent hiring, training, and supervision of Luna (negligent hiring); and (3) VTA's direct liability for negligent maintenance or repair of the train (negligent maintenance). VTA's motion addressed these theories of liability separately, as it was required to do, since the issues on a motion for summary judgment are framed by the pleadings. And the trial court's order granting summary adjudication of the negligence claim analyzed each theory of liability separately, using the same groupings VTA had used.

Citing *Catalano*, *supra*, 82 Cal.App.4th 91, Plaintiff argues that since "summary judgment cannot be granted on a part of a cause of action, if there are facts supporting a triable issue for any negligence alleged in the cause of action, the motion must be denied." VTA argues that "by not thoroughly briefing the issues" and by failing to provide reasoned argument with citation to authority, Plaintiff concedes the evidence presented to the trial court was sufficient to support summary adjudication of the negligent training and negligent maintenance claims and that Plaintiff has therefore forfeited any challenge to the trial court's ruling on those claims.

The parties do not cite any cases that address the question whether a court may summarily adjudicate negligence claims that are based on different wrongful acts or theories of liability. In *Lilienthal*, *supra*, 12 Cal.App.4th 1848, the plaintiffs sued their former attorneys for legal malpractice. The complaint contained two causes of action: breach of contract and negligence. Although the defendants in *Lilienthal* provided legal services to the plaintiffs at different times on two separate and distinct matters (the Murillo matter and the Barton matter), the complaint combined the two matters in each cause of action. The defendants filed a motion for summary adjudication arguing, among other things, that the malpractice claim as to the Murillo matter was barred by the statute of limitations. The trial court denied the motion reasoning that summary adjudication would not dispose of an entire cause of action. (*Id.* at pp. 1850-1851.) But the appellate

17

court issued a peremptory writ, directing the trial court to vacate its order and consider the motion on the merits. (*Id.* at p. 1855.)

The *Lilienthal* court held that "a party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts alleged in the same cause of action." (*Lilienthal*, *supra*, 12 Cal.App.4th at pp. 1854-1855.) The court examined the meaning of "cause of action" in section 473c, subdivision (f). It observed that "California courts have defined cause of action as ' "simply the obligation sought to be enforced." ' [Citation.]" (*Lilienthal*, at p. 1853.) " 'In a broad sense, a "cause of action" is the *invasion of a primary right* (e.g. injury to person, injury to property, etc.). . . . [¶] However, in more common usage, "cause of action" means a group of related paragraphs in the complaint reflecting *a separate theory of liability*. . . . [¶] As used in [section] 437c[ subdivision ](f), "cause of action" should be interpreted in the latter sense (theory of liability).' " (*Lilienthal*, at p. 1853, citing Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1992 § 10-39, p. 10-12.1, italics in original.)

The *Lilienthal* court concluded: "In the instant case, plaintiffs seek to recover damages based on two separate and distinct obligations. Each obligation creates a separate and distinct claim. The first obligation relates to legal services performed on the Murillo matter, and the second obligation relates to legal services performed on the Barton matter. There is no dispute that the two matters have no relation to each other and involve legal services performed at different times, with different and distinct obligations, and distinct and separate alleged damages. Under California law, the allegations relating to the Murillo and Barton matters involve two separate and distinct causes of action regardless of how pled in the complaint." (*Lilienthal*, *supra*, 12 Cal.App.4th at p. 1854.)

The court also concluded that the policy behind summary adjudication motions, "to 'promote and protect the administration of justice, and to expedite litigation by the elimination of needless trials,' " was not effectively served by denying summary

18

adjudication. (*Id.* at p. 1854.) " '[The] statement and the wording of subdivision (f) show clearly that the Legislature wished to narrow summary adjudication from its [former] broad focus on 'issues' (sometimes interpreted to mean only asserted "facts") to a more limited focus on causes of action, affirmative defenses, claims for punitive damages and claims that defendants did not owe plaintiffs a duty.' " (*Lilienthal*, at p. 1854.) Although in *Lilienthal* each claim was joined with the other claim within each cause of action, the claims were in fact separate and distinct causes of action, having no relationship to each other. Thus, the *Lilienthal* court held, section 437c, subdivision (f) could properly be utilized to challenge each separate and distinct matter. (*Lilienthal*, at pp. 1854-1855.)

*Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110 (*Fineman*) is also instructive. In that case, the plaintiff sued Bank of America for honoring 83 company checks signed by only one of two required signatories. Bank of America moved for summary adjudication on the ground that claims as to 23 of the 83 checks were time-barred. The trial court granted the motion, and the appellate court concluded that summary adjudication was proper, holding that, for purposes of section 437c, subdivision (f), payment of each of the checks constituted a "separate and distinct wrongful act" under *Lilienthal*. (*Fineman*, at p. 1118.)

In *Catalano*, *supra*, 82 Cal.App.4th at pages 93-94—which Plaintiff cites—the plaintiffs alleged fraudulent breach of fiduciary duty and intentional misrepresentation against their former attorneys, and they sought punitive damages. The defendant moved for summary adjudication of the punitive damages claim based on five different factual allegations. The trial court granted summary adjudication on four of the five grounds asserted, but denied the motion as to the fifth ground. The appellate court concluded that "[s]uch piecemeal adjudication of factual allegations supporting a claim for punitive damages is prohibited by . . . section 437c, subdivision (f)(1) unless the entire claim for punitive damages can be eliminated. Unlike the claims in *Lilienthal*, which were

19

completely separate and distinct, having nothing to do with one another, the claim for punitive damages here is based on an interrelated set of facts and circumstances. If any one or more of the facts would support a claim for punitive damages, then summary adjudication is not available to eliminate from trial other facts relating to the claim for punitive damages." (*Id.* at pp. 97-98; see also *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 251 [separate acts that are part of a pattern of workplace discrimination cannot be summarily adjudicated].)

In both *Lilienthal* and *Fineman* the allegations of the complaint could be divided into separate and distinct wrongful acts, some of which were barred by the statute of limitations. As we have noted, in its motion, VTA divided the negligence cause of action into three separate theories, and the trial court adopted that same structure in its order. But Plaintiff actually alleged negligence on more than three grounds. What we have called the "negligent maintenance" theory actually alleged five separate wrongful acts, and the "negligent training" theory alleged three different wrongful acts. As we shall explain, even if we were to conclude that VTA's three theories of negligence liability were sufficiently separate and distinct that they could be summarily adjudicated separately, there are grounds for reversal under each theory.

## IV. *Negligence Cause of Action*

The elements of a cause of action for negligence are: (1) a legal duty to use due care; (2) a breach of that duty; (3) proximate or legal cause; and (4) resulting injury. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.) In its motion, VTA focused on the second element and argued it had not breached any duty of care to Plaintiff.

To determine the propriety of granting summary adjudication of the negligence cause of action, we must examine each of the different theories of liability alleged in the complaint. For ease of reference, we shall divide our discussion into the same three categories the parties and the trial court used below.

20

## A. Negligent Maintenance of Train

Plaintiff alleged VTA negligently "managed, maintained, . . . , repaired, manufactured and designed" the light rail train involved in the accident. VTA argued in its motion that "[t]he general allegation that the train was negligently manufactured and/or designed is without meaning since plaintiff has not named the designer or manufacturer . . . and[,] since no employee of defendant had anything to do with the design or manufacturing of the train[,] no liability can be imposed on VTA." This is all VTA's points and authorities had to say regarding these theories of liability. And VTA's separate statement did not contain an undisputed material fact (UMF) that addressed these allegations. In his opposition, Plaintiff did not bring any of these failings to the trial court's attention. Nor did he submit any argument or new facts to support these allegations.

In its order granting summary adjudication on this theory, the trial court (1) addressed only the allegations of negligent manufacture and design, (2) held the complaint did not contain sufficient facts to state a cause of action for negligent manufacture or design, and (3) stated, "Plaintiff seemingly concedes there is no evidence in support of negligent manufacture/design of the train." The court did not mention the negligent management, maintenance, or repair of the train allegations.

As the party moving for summary judgment, VTA had the burden to show it was entitled to judgment with respect to all theories of liability asserted by Plaintiff. (*Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 707.) Thus, VTA bore the initial burden of production to make a prima facie showing there were no triable issues of material fact with regard to the claim that VTA negligently "managed, maintained, . . . , repaired, manufactured and designed" the train. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) To accomplish this, VTA was required to present either (1) affirmative evidence negating, as a matter of law, an essential element of Plaintiff's claim; or (2) evidence that Plaintiff

21

"does not possess, and cannot reasonably obtain, needed evidence." (*Guz*, *supra*, 24 Cal.4th at p. 334; *Aguilar*, at p. 854.) Since VTA did not meet its initial burden of production, the burden never shifted to Plaintiff to show that a triable issue of material fact existed. (§ 437c, subd. (p)(1), (2); *Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 353.) VTA's motion for summary adjudication must therefore be denied with regard to this theory. (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 468.)

## B. Negligent Hiring, Training, and Supervision

Plaintiff's complaint also alleged VTA "negligently hired, trained, and/or supervised" its agents and employees "in such a fashion as to cause and/or contribute to" the accident.

As to negligent hiring, "an employer can be held liable for negligent hiring if he [or she] knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him [or her]. [Citations.]" (*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 843 (*Evan F.*).) In support of its motion, VTA presented evidence that during the hiring process, it conducted criminal background and DMV checks on Luna and had him fingerprinted, and that Luna "successfully cleared the entire process." VTA also presented evidence that Luna successfully completed his training and had no rule violations or operational deficiencies to suggest he was unfit to operate a light rail train. VTA thus met its initial burden to make a prima facie showing to shift the burden to Plaintiff to produce evidence that created a triable issue on the negligent hiring theory. Plaintiff did not dispute any of VTA's facts relating to negligent hiring and did not submit any new facts to demonstrate VTA knew, had reason to believe, or failed to use reasonable care to discover that Luna was unfit to operate a light rail train before hiring him.

As for negligent training, VTA presented evidence that Luna (1) completed two or three months of training as a light rail operator when assigned those duties in 2001; (2) completed a one-month refresher course when he returned to train operation in 2005; (3) completed two days of recertification training each year; (4) was tested on safety procedures in 2009; and (5) was trained on defensive driving techniques and audible warning protocols. VTA also presented evidence that Luna met all testing and training requirements, did not have any safety violations, and was never required to undergo retraining because of operational deficiencies or rules violations. This was sufficient for VTA to meet its initial burden to make a prima facie showing to shift the burden to Plaintiff to produce evidence that created a triable issue on the negligent training theory.

In opposition to the motion, Plaintiff presented excerpts from Luna's deposition in which he testified that (1) prior to the accident, he had seen pedestrians use the Crossing to cross over the northbound light rail tracks at the Fruitdale station, and (2) he did not receive any training on specific precautions to be taken when approaching the Fruitdale station because of the presence of the Crossing. Luna also testified there are four other stations on the Mountain View-Winchester line that have this type of pedestrian crossing. We conclude the evidence that Luna had not received any training on how to approach the Crossing was sufficient to create a triable issue on the negligent training claim and preclude summary adjudication of the negligence cause of action based on this theory.

As for alleged negligent supervision, VTA presented evidence that: (1) VTA light rail operators are supervised by dispatchers, rail control supervisors via radio, and field supervisors; (2) VTA's supervisory staff completed 37 unannounced ride checks on Luna's trains (more than 4 per year) that did not uncover any operational deficiencies or require retraining; and (3) VTA supervisors issued memoranda regarding the proper use of warning devices. Luna had also driven a light rail train for approximately five years and had not had any prior collisions while operating a train. This was sufficient for VTA to meet its initial burden to make a prima facie showing to shift the burden to Plaintiff to

23

produce evidence that created a triable issue relating to negligent supervision. Plaintiff did not dispute any of VTA's facts relating to negligent supervision and did not submit any new facts to support his claim. Therefore, the trial court properly granted summary adjudication on this theory.

In summary, with regard to the allegation that VTA negligently "hired, trained, and/or supervised" its agents and employees, we conclude that while VTA met its burden of making a prima facie showing of the nonexistence of any triable issue of fact with regard to these theories of liability, Plaintiff met his burden of producing evidence that created a triable issue of fact on the question of negligent training, which precludes summary adjudication.

### C. Negligent Operation of Train

Although VTA's motion was directed to the breach element, on appeal, the parties dispute whether the ordinary duty of care or the heightened duty of a common carrier applies in this case.

The duty of a train operator toward persons using a railroad crossing is " 'to *exercise ordinary care to discover* any such persons on or near the crossing and to exercise ordinary care to avoid injuring such persons after their presence on or near the track [is] discovered.' " (*Essick v. Union Pacific Railway Co*. (1960) 182 Cal.App.2d 456, 461; original italics.) In *Essick*, which involved a collision between a train and a car, the court stated: "Obviously, the railroad may not be required to guarantee the safety of those crossing its tracks. It is not required to anticipate that at every crossing, an automobile will be driven in the path of the train. It is only required to use ordinary care to discover such automobiles and to thereafter exercise care to avoid a collision." (*Id.* at p. 463.) In *Herrera v. Southern Pacific Co*. (1957) 155 Cal.App.2d 781, 785, the court explained: "The train crew cannot assume that a highway crossing in the middle of a city will be clear and they must keep a reasonable lookout for the

24

presence of intersecting traffic.  [Citations.]  This implies as a corollary the further obligation to have the train under such control as may be reasonably necessary to deal with situations which an ordinarily prudent operator would anticipate."

As for the duty of a common carrier, "[t]he special relationship of common carrier and passenger gives rise to the highest duty of care." (*McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011, 1017 (*McGettigan*).)  "Civil Code section 2100 provides:  'A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill.'  The duty imposed by [Civil Code] section 2100 applies to public carriers as well as private carriers and requires them to do all that human care, vigilance, and foresight reasonably can do under the circumstances.  [Citation.]  Common carriers are not, however, insurers of their passengers' safety.  Rather, the degree of care and diligence which they must exercise is only such as can reasonably be exercised consistent with the character and mode of conveyance adopted and the practical operation of the business of the carrier.  [Citations.]" (*Lopez v. Southern Cal. Rapid Transit Dist*. (1985) 40 Cal.3d 780, 785.)

The court in *McGettigan* noted that "this heightened degree of care is owed only while 'passengers are *in transitu*, and until they have safely departed the carrier's vehicle.' [Citation.]  . . . ' "[t]he passenger while in actual progress upon his journey is exposed to countless hazards, gives himself wholly in charge of the carrier. . . .  But . . . a passenger's entrance to the carrier's station is characterized by none of the hazards incident to the journey itself" ' " and after the passenger has exited the carrier's vehicle, the carrier is bound to exercise only a reasonable degree of care for the protection of its passengers. (*McGettigan*, *supra*, 57 Cal.App.4th at pp. 1017-1018, italics in original.) The plaintiff in *McGettigan* alleged that before being injured, he was ordered off of a Bay Area Rapid Transit (BART) train and left standing on the platform.  Due to his extreme inebriation, he could not recall how he was injured.  The court concluded that "[o]nce he

25

had safely exited the train, the relationship of carrier and passenger terminated. He was in a place of relative safety" and the heightened duty of care owed by a common carrier to its passengers did not apply. (*Ibid.*)

Plaintiff argues that the heightened duty of care of a common carrier applies because Plaintiff had not reached "a place outside the sphere of any activity of the carrier which might reasonably constitute a mobile or animated hazard to the passenger" and that *McGettigan* is distinguishable. We need not determine whether the duty of ordinary care of a train operator at a crossing or the heightened duty of a common carrier applies, since we conclude there are triable issues of fact that preclude summary adjudication even under the lower standard of care. As we shall explain, there are disputed factual issues regarding the speed of the train as it approached the Crossing and the speed limit at the Crossing that preclude summary adjudication of the claim based on alleged negligent operation of the train.

### 1. Disputed Facts Regarding Speed of Train

Luna's testimony was inconsistent with respect to when he moved his controller into the B3 brake setting, which in turn impacted the train's speed. He testified that he generally moves the controller into the B3 position when he is 100 feet from the station. He stated that on the day of the accident, he moved the controller into the B3 position when the train was 40 feet from the platform. Later, he testified that he moved the controller into the B3 position when he was an eighth of a mile (approximately 660 feet) from the station.

Luna estimated that he first saw Plaintiff on the platform, walking toward the Crossing, when the train was an eighth of a mile from the platform. At that point, the controller was in the B3 position and his speed was 25 miles per hour. Luna also testified that the train was traveling 15 miles per hour when he saw Plaintiff swing the gate open

26

about four seconds prior to impact and that the train was traveling less than 15 miles per hour at the time of impact.

Stephen Werner (VTA's accident reconstruction expert) determined that the train was "traveling no more than 30 miles per hour" when Luna applied maximum braking. Based upon his review of the "train video," David Rondinone (Plaintiff's accident reconstruction expert) opined that: (1) 15 seconds before impact, the train was traveling approximately 45 miles per hour; (2) when Plaintiff opened the gate at the Crossing (four seconds before impact), the train was traveling 30 miles per hour; (3) Luna took more than one second to react and apply maximum braking; (4) at the time of impact, the train was traveling 20 miles per hour.

In summary, the parties agree that Plaintiff opened the gate four seconds before impact. Luna testified that his speed at that point was 15 miles per hour; Rondinone opined that it was 30 miles per hour. Werner opined that one second later, Luna's speed was less than 30 miles per hour. Luna testified that his speed at the time of the impact was less than 15 miles per hour and Rondinone opined that it was 20 miles per hour. Thus, there are disputed factual issues regarding how fast the train was going as it approached the Crossing and when it hit Plaintiff.

### 2. *Disputed Facts Regarding Speed Limit at Crossing*

Luna testified that if the operator intends to stop at the Fruitdale station—as he did at the time of the accident—the speed limit is 15 miles per hour when the front of the train enters any portion of the station. Luna also testified that because the Fruitdale station is a "no-horn" area, he generally enters the station at 15 miles per hour. In addition to this testimony, the parties submitted evidence regarding CPUC regulations governing speed limits on light rail transit lines.

The CPUC is charged with adopting rules and regulations regarding the procedures for all rail transit systems in California. (Pub. Util. Code, § 778.) VTA is

27

"subject to the regulations of the [CPUC] relating to safety appliances and procedures." (Pub. Util. Code, § 100168.) To that end, the CPUC has adopted General Order 143-B, which sets forth safety rules and regulations for light rail transit systems. "The purpose of these rules and regulations is to establish safety requirements governing the design, construction, operation, and maintenance of light-rail transit systems in the State of California." (General Order 143-B, § 1.03.)

Part 7 of General Order 143-B contains rules regarding "operating speed and train protection requirements." Part 7 begins with section 7.01, the "Basic Speed Rule," which provides: "The other provisions of this part notwithstanding, the operator of [a light rail vehicle] shall at all times operate at a safe speed that is consistent with weather, visibility, track conditions, traffic, traffic signal indications, and the indications of [automatic train protection] systems where used." (General Order 143-B, §§ 7.01, 2.02, 2.09.)

Section 7.03 of the order provides that the "maximum speeds permitted on [light rail transit] shall be established in accordance with the requirements presented in Table 1." (General Order 143-B at §§ 7.03, 2.08.) Table 1 of General Order 143-B (hereafter Table 1) sets forth "maximum permitted speeds" for light rail systems that range from 20 miles per hour to 55 miles per hour, depending on the location's (1) alignment classification ("exclusive," "semi-exclusive," or "non-exclusive" as defined in section 9.04); (2) crossing or intersection controls; and (3) the type of "train protection" in place.

Section 7.05 of General Order 143-B, which is entitled "Speed Permitted On Pedestrian Malls," provides: "Maximum [light rail vehicle] speed permitted on a promenade, pedestrian walk, concourse, mall, or plaza, which is closed to motor vehicles but where pedestrian movement across the tracks is authorized, is 20 miles per hour unless otherwise restricted (see Table 1 . . .)." (General Order 143-B, §§ 7.05, 2.09.) This speed limit is the same as that stated for alignment classification 9.04(c)(2) on Table 1. Table 1 also provides that "lower speeds"—speeds less than 20 miles per hour—"may be required for malls paved flush with the tracks."

28

The parties disagree as to which General Order 143-B alignment classification applies to the Crossing for the purpose of determining the maximum speed permitted at the Crossing under the order. Plaintiff asserts that the Crossing falls under alignment classification 9.04 (c)(1), which applies to a "pedestrian mall" and is subject to a 20 mile-per-hour speed limit. Plaintiff argues that under General Order 143-B, section 7.05, a "pedestrian mall" is defined as "a promenade, pedestrian walk, concourse, mall or plaza, which is closed to motor vehicles but where pedestrian movement across the tracks is authorized." Plaintiff contends the Crossing meets this definition because it was a pedestrian walkway that permitted movement across the northbound tracks and was closed to vehicular traffic. Indeed, the photographs in evidence support that assertion. Plaintiff contends the trial court erred when it concluded that section 7.05 and its 20-mile-per-hour speed limit do not apply because the Crossing is not a pedestrian mall.

VTA contends the Crossing falls under alignment classification 9.04(b)(1), for "semi-exclusive" alignments, which are defined as a "[f]ully exclusive right-of-way with at-grade crossings, protected between crossings by a fence or substantial barrier, if appropriate to the location." The photographs in evidence also support that assertion. VTA argues that according to Table 1, the maximum permitted speed for the Crossing is 55 miles per hour since the Crossing was protected by flashing lights, bells, gates and automatic block signal (ABS) protection. (VTA did not submit any evidence that explains ABS protection or that the Crossing affords ABS protection.)

According to Table 1, the speed limit at semi-exclusive crossings is 35, 45, or 55 miles per hour or "no limit," depending on the type of "crossing or intersection control" at the location. The parties characterize this as a legal question that requires us to interpret General Order 143-B, section 7.05. But in our view, the applicability of section 7.05 and the selection of the proper "maximum permitted speed" from Table 1 is primarily a factual question, since the maximum permitted speed is based on the existence of a number of facts, including: the alignment classification, crossing or

intersection controls; and the type of "train protection." The "Notes" on Table 1 suggest that "stopping sight distance" and whether the location is a "mall paved flush with the tracks" also affect the maximum permitted speed. The evidence submitted both in support of and in opposition to the motion for summary judgment is insufficient to make that determination.

In summary, Luna testified that the speed limit as he entered the Fruitdale station was 15 miles per hour. The record does not reveal whether Luna's testimony was based on General Order 143-B, some other CPUC rule, a VTA rule, or some other fact. The parties dispute whether the maximum permitted speed at the Crossing under General Order 143-B is 25 miles per hour or 55 miles per hour. That the parties dispute the application of section 7.05 of General Order 143-B and the broader question of what is the maximum permitted speed at the Crossing reinforces our conclusion that there are triable issues of fact regarding the speed limit at the crossing. Finally, the operation of the train was also subject to the Basic Speed Rule, which requires the operator to operate the light rail train "at a safe speed that is consistent with weather, visibility, track conditions, traffic, traffic signal indications, and the indications of [automatic train protection] systems where used." A maximum speed limit is not a license, or requirement, to travel at that maximum speed under all circumstances. (*Walters v. Du Four* (1933) 132 Cal.App. 72, 83.) Negligence may occur because a train operator drives too fast under the circumstances, even though not exceeding the maximum speed limit. Where conditions and circumstances and the safety of persons and property require a speed less than the maximum speed limit, it is the duty of the train operator to slow the speed of the train. (See *Dam v. Bond* (1926) 80 Cal.App. 342, 350.) A trier of fact could conclude, under all of the circumstances, that a speed less than 15 miles per hour was required under the Basic Speed Rule and that, even if the train was traveling 15 miles per hour as it entered the station, Luna breached his duty of ordinary care.

30

We conclude that disputed factual issues regarding the speed limit at the Crossing also preclude summary adjudication of the negligent train operation claim.

### 3. *Plaintiff's Comparative Negligence*

VTA acknowledges this case is subject to a comparative negligence analysis. (*Li v. Yellow Cab* (1975) 13 Cal.3d 804.) But VTA argues the accident was due to Plaintiff's sole negligence as a matter of law. Based upon video images in the record, VTA has made a showing that the accident was due primarily, if not entirely, to Plaintiff's negligence. But given the disputed factual issues regarding the train's speed as it approached the station, the applicable speed limit, and the question whether Luna violated the duty of ordinary care, we cannot say as a matter of law that a jury would not assign even a small portion of responsibility for the accident to Luna and VTA. As we have explained, VTA is not required to guarantee the safety of those crossing its tracks or to anticipate that a pedestrian will step into the path of a train at every crossing. "It is only required to use ordinary care to discover such [persons] and to thereafter exercise care to avoid a collision." (*Essick*, *supra*, 182 Cal.App.2d at p. 463.) But the factual disputes regarding the speed limit and the train's speed preclude a determination that the accident was based on Plaintiff's sole negligence as a matter of law.

On appeal, the parties dispute whether Vehicle Code section 22451, subdivision (a) applies in this case. That code section provides, in relevant part, that a "pedestrian approaching a . . . rail transit grade crossing shall stop not less than 15 feet from the nearest rail and shall not proceed until he or she can do so safely, whenever the following conditions exist: [¶] (1) A clearly visible electric or mechanical signal device . . . gives warning of the approach or passage of a train . . . . [¶] (2) An approaching train . . . is plainly visible or is emitting an audible signal and, by reason of its speed or nearness, is an immediate hazard." In light of our conclusions, we need not reach the legal question whether Vehicle Code section 22451, subdivision (a) applies here.

31

### D. Conclusion

Regarding the allegations that VTA negligently "managed, maintained, . . . , repaired, manufactured and designed" the subject train, we conclude that VTA did not meet its initial burden of production to state a prima facie case and the burden therefore never shifted to Plaintiff to show that a triable issue of material fact existed. As for allegations that VTA "negligently hired, trained, and/or supervised" its agents and employees, although VTA met its initial burden on the motion, Plaintiff met his burden of producing evidence that created a triable issue of fact on the question of negligent training, which precludes summary adjudication on this theory. Finally, disputed factual issues regarding the speed limit at the Crossing and the train's speed as it approached the Crossing preclude summary adjudication of the negligent train operation claim. For these reasons, we conclude the court erred when it granted summary adjudication of the negligence cause of action.

### V. *Dangerous Condition of Public Property Claim and Design Immunity*

The cause of action for dangerous condition of public property against VTA "is defined by statute, specifically the portion of the Government Claims Act entitled Liability of Public Entities and Public Employees. (Gov. Code, §§ 814-895.8, added by Stats. 1963, ch. 1681, § 1, pp. 3266-3284; see *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 741-742 . . . .) These statutes declare a general rule of immunity (Gov. Code, § 815) and then set out exceptions to that rule. Plaintiff invokes the exception for a dangerous condition of public property, as set out in Government Code section 835 . . . ." (*Cole*, *supra*, 205 Cal.App.4th at p. 757.)

As set forth in Government Code section 835, the cause of action for dangerous condition of public property consists of the following elements: "(1) a dangerous condition of public property; (2) a foreseeable risk, arising from the dangerous condition,

32

of the kind of injury the plaintiff suffered; (3) actionable conduct in connection with the condition, i.e., either negligence on the part of a public employee in creating it, or failure by the entity to correct it after notice of its existence and dangerousness; (4) a causal relationship between the dangerous condition and the plaintiff's injuries; and (5) compensable damage sustained by the plaintiff." (*Cole*, at p. 758.)

VTA is entitled to summary adjudication of the dangerous condition claim if it demonstrated either that (1) Plaintiff was unable to establish one of the elements of his claim or (2) VTA possessed a complete defense to Plaintiff's cause of action. (*Cole*, *supra*, 205 Cal.App.4th at p. 758, citing § 437c, subds. (p)(2), (n).) VTA's motion for summary adjudication attacked this cause of action in two ways. First, VTA argued that Plaintiff could not establish the first element: that there was a dangerous condition at the Crossing. Second, VTA relied on the design immunity defense (Gov. Code, § 830.6). The trial court agreed that Plaintiff could not establish that there was a dangerous condition at the Crossing; consequently, it did not address VTA's design immunity defense. We begin our analysis by addressing design immunity.

### A. Legal Principles Regarding Design Immunity

Design immunity is an affirmative defense a public entity defendant must plead and prove. (*Cameron v. State* (1972) 7 Cal.3d 318, 325 (*Cameron*).) Government Code section 830.6, which sets forth the defense, provides in relevant part: "Neither a public entity nor a public employee is liable . . . for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have

33

adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor."

A public entity claiming design immunity must establish three elements: "(1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 66, 69 (*Cornette*).)

Design immunity reflects the Legislature's intent to insulate discretionary planning and design decisions by responsible public officials from review in tort litigation. (*Baldwin v. State* (1972) 6 Cal.3d 424, 434, superseded by statute on another ground as stated in *Cornette*, *supra*, 26 Cal.4th at pp. 70-71.) The purpose of design immunity "is to prevent a jury from second-guessing the decision of a public entity by reviewing the identical questions of risk that had previously been considered by the government officers who adopted or approved the plan or design. [Citation.]" (*Cornette*, *supra*, 26 Cal.4th at p. 69.) "[T]o permit reexamination in tort litigation of particular discretionary decisions where reasonable [people] may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." (*Ibid.*, internal quotation marks and citations omitted.)

To obtain summary adjudication on its affirmative defense of design immunity, VTA had the initial burden to "show" a "complete defense." (§ 437c, subd. (p)(2).) To meet that burden, VTA was required to present admissible evidence on each element of the defense upon which it bears the burden of proof at trial. (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289.) Lack of substantial evidence on any one element bars relief, "even if the plaintiff failed to introduce a scintilla of evidence challenging that element." (*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 831.)

34

**B. Evidence Relating to Design Immunity Defense**

VTA's evidence in support of its design immunity defense included the declaration of Mark Robinson, VTA's Chief Engineering and Construction Officer. Robinson was the "Vasona Project Manager" and oversaw the design and approval of the Vasona Light Rail Project (VLRP), including the construction of the Crossing. Robinson declared that design engineers hired by VTA prepared the design of the Crossing, but he did not identify those engineers by name. Robinson further declared that: (1) the CPUC is charged with approval of all California rail projects; (2) he presented the design of the Crossing to the CPUC for approval in May 2001; (3) the CPUC approved the design in November 2001; (4) VTA "adopted" the CPUC's "design plan approval"; and (5) "[a]ll pedestrian warning devices were installed as approved."

The CPUC has "safety jurisdiction over VTA's light rail transit crossings" under Public Utilities Code sections 99152, 778, and 100168. (*Santa Clara Valley Transportation Authority v. Public Utilities Com*. (2004) 124 Cal.App.4th 346, 354, 365.) Robinson attached a copy of the CPUC Decision to his declaration. In that decision, the CPUC approved the construction of three crossing on the VLRP, including the subject Crossing. According to the CPUC Decision, VTA approved the project on May 4, 2000, almost a year before it sought CPUC approval.

VTA submitted its application to the CPUC in May 2001. The CPUC's Rail Safety and Carrier's Division–Railroad Crossings Engineering Section staff inspected the site of and examined the need to construct the proposed crossings and recommended that VTA's application be approved. The CPUC ordered that "[p]rotection at the crossings shall be as indicated by text, plans attached to [VTA's] application and as further described by Appendices A and B of this order." The CPUC approved the construction of the three crossings on November 29, 2001.

The CPUC order approved the placement of the Crossing at the southern end of the station platform. It ordered that: "Pedestrian warning signs 'LOOK BOTH WAYS' will be placed at the crossing. Two sets of pedestrian ADA tactile warning strips, (with a swing gate outside of the freight tracks), will be placed at the crossing, two at the ends of the platform and also at the fenced boundaries of the station area. Three sets of pedestrian flashers will be located to warn pedestrians crossing the tracks. One two-way set will be situated at the end of the platform and one set with a direction flasher at the fenced boundary of the station area." VTA also presented evidence that there were no prior reported accidents at the Crossing in the more than four and one half years between the time the station opened and the accident.

In opposition to the motion, Plaintiff argued there was no admissible evidence the CPUC "approved the plan details of [the Crossing] as it was built" or that the CPUC considered or approved the design features at issue: the absence of a locking gate and the placement of the walkway. (In fact, Robinson had declared that all pedestrian warnings were installed as approved by the CPUC.)

Plaintiff's evidence in opposition to the motion included the declarations of mechanical engineering expert David Rondinone and civil engineering expert John Glennon. Rondinone opined that the "presence of an automatic pedestrian gate or one-way gate interlock would have prevented [Plaintiff] from entering the [Crossing] while the subject train was approaching the station." Rondinone stated it would require "very little additional work" to install such a gate since the "electronics, sensors and controls" for such a gate were already present. He also stated that such an automatic gate was installed at the pedestrian crossing at the northern end of the station. Among other things, Glennon opined that the signs and other devices at the Crossing did not comply with the requirements and standards of the Manual on Traffic Control devices published by the Federal Highway Administration (MUTCD).

36

In its reply, VTA submitted: (1) a copy of its application to the CPUC, which included engineering plans and drawings for the Crossing prepared by Korve Engineering and approved by the "Vasona General Design Consultant, Parsons, Brinckerhoff, Quade & Douglas, Inc. in association with MK Centennial and Korve Engineering" (Design Consultant); and (2) nine pages of as-built plans for the Crossing. According to VTA's CPUC application, the crossings were reviewed by the "Field Diagnostic Team Process" for the VLRP, which included representatives from the CPUC, VTA, the City of San José, Caltrans, and the Union Pacific Railroad. "[C]omments from all parties were incorporated into the design of [the Crossing]."

Plaintiff objected to this "newly presented evidence" on the ground it deprived him of his due process. He argued he had not been given an opportunity to respond, the evidence was not referenced in VTA's moving papers, and VTA's counsel lacked sufficient personal knowledge to authenticate the additional documents. Because Plaintiff does not renew these objections on appeal, we conclude the objections have been forfeited and we shall consider the evidence VTA submitted with its reply.

## C. Analysis

The first element to establish design immunity (a causal relationship between the plan or design and the accident) requires proof that the alleged design defect, as opposed to some other cause, was responsible for the accident. (*Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931, 940, citing *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 570, 575 [causation negated by evidence showing poor maintenance and clogging of drainage system, not merely system's design].) On summary adjudication, the defendant may rely on the allegations of the complaint to establish this element, as VTA did in this case. (*Alvis v. County of Ventura* (2009) 178 Cal.App.4th 536, 550, citing *Fuller v. Department of Transportation* (2001) 89 Cal.App.4th 1109, 1114.)

"The second element, discretionary approval prior to construction, 'simply means approval in advance of construction by the legislative body or officer exercising discretionary authority.' [Citation.] A detailed plan, drawn up by a competent engineering firm, and approved by a city engineer in the exercise of his or her discretionary authority, is persuasive evidence of the element of prior approval. [Citation.]" (*Grenier*, *supra*, 57 Cal.App.4th at pp. 940-941, citing (*Ramirez v. City of Redondo Beach* (1987) 192 Cal.App.3d 515, 526 (*Ramirez*).) Design immunity does not immunize decisions that were not made. "Thus, the injury-producing feature must have been a part of the plan approved by the governmental entity." (*Grenier*, at p. 941.)

In *Higgins v. State of California* (1997) 54 Cal.App.4th 177 (*Higgins*), the court explained that a "[c]ausal relationship is proved by evidence the injury-producing feature was actually a part of the plan approved by the governmental entity: Design immunity is intended to immunize only those design choices which have been made. A case in point is *Cameron*[, *supra*,] 7 Cal.3d 318, 326 . . . , where superelevation around a curve constituted the dangerous condition causing [the] plaintiffs to lose control of their car. The plans showed many aspects of the roadway, but there was no evidence 'the superelevation which was actually constructed on the curve . . . was the result of or conformed to a design approved by the public entity vested with discretionary authority.' (*Id.* at p. 326.) The state thus failed to prove the causation element—that a discretionary decision was actually made regarding the dangerous condition which caused the plaintiffs' accident. (*Ibid.*)" (*Higgins*, at pp. 185-186.)

"The third element of design immunity, substantial evidence of reasonableness of design, requires only substantial evidence. '[A]s long as reasonable minds can differ concerning whether a design should have been approved, then the governmental entity must be granted immunity. The statute does not require that property be perfectly designed, only that it be given a design which is reasonable under the circumstances.' [Citation.] Generally, a civil engineer's opinion regarding reasonableness is substantial

38

evidence sufficient to satisfy this element. [Citation.] Approval of the plan by competent professionals can, in and of itself, constitute substantial evidence of reasonableness. [Citation.]" (*Grenier*, *supra*, 57 Cal.App.4th at p. 941.)

The normal rules governing motions for summary judgment, which require that the motion be denied if the party opposing the motion raises any triable issue of material fact, do not apply to the third element of the design immunity defense. (*Wyckoff v. State of California* (2001) 90 Cal.App.4th 45, 50-51 (*Wyckoff*).) " '[T]he defendant is not required to prove to the court that the design or plan was in fact a reasonable one. Instead, the defendant is merely required to adduce any "substantial evidence" that a reasonable public employee or legislative body could have approved the plan or design used . . . .' " (*Id.* at p. 51.) "We are not concerned with whether the evidence of reasonableness is undisputed; the statute provides immunity when there is substantial evidence of reasonableness, even if contradicted." (*Grenier*, *supra*, 57 Cal.App.4th at p. 940.) "That a plaintiff's expert may disagree does not create a triable issue of fact." (*Id.* at p. 941.)

Plaintiff argues that VTA failed to present evidence that the Crossing "was constructed as approved, that the issue of a locking mechanism was considered by the approving agency or that [the] approving agency exercised its discretion in approving signs and other devices that did not comply with the requirements and standards of the MUTCD." We shall analyze each alleged dangerous condition separately.

### 1. *Placement of Crossing at Southern End of Platform*

VTA presented evidence of multiple layers of design approval for the construction of the Pedestrian Crossing. The plans were prepared by Korve Engineering and approved by the Design Consultant engineers. VTA approved the design of the Crossing in May 2000, a year before it sought CPUC approval. As part of the CPUC approval process, the CPUC's Railroad Crossing Engineering Section staff inspected the site and recommended

39

approval of the Crossing design to the CPUC. And finally, the five-member CPUC board approved VTA's plans for the construction of the Crossing.

Regarding the alleged dangerous condition based on the location of the Crossing, the plans prepared by Korve Engineering and approved by Design Consultant engineers showed placement of the Pedestrian Crossing at the southern end of the platform. Thus, the location of the Crossing was considered by and approved by VTA's engineers, the Design Consultant, and VTA's governing board when it approved the plans. In its application to the CPUC, VTA specifically sought approval of its plan to construct an at-grade pedestrian crossing at that location. This satisfies the causation and discretionary approval elements of the design immunity defense. Plaintiff does not present any evidence that creates a triable issue on these two elements. The subsequent approval of the Crossing at that location by the CPUC satisfies the reasonableness element. Although Plaintiff's evidence may create a triable issue as to the reasonableness of the location of the crossing, that evidence does not preclude summary adjudication of the design immunity defense. (*Wyckoff*, *supra*, 90 Cal.App.4th at pp. 50-51.) Thus, VTA was entitled to design immunity with regard to the location of the Crossing.

Plaintiff contends that the placement of the Crossing at the southern end of the platform encourages illegal jaywalking. The gate on the street side of the Crossing leads to a sidewalk that runs along the station side of Southwest Expressway. Across the street from that gate is a side street that leads to Plaintiff's apartment complex. Although there were no crosswalks or signals at the T-intersection between the side street and Southwest Expressway at the time of Plaintiff's accident, it would have been legal to cross from the sidewalk outside the station to one of the corners on the opposite side of the street.

### 2. *Absence of Automatic Locks on the Swing Gates*

We next consider whether VTA is entitled to design immunity as to the alleged dangerous condition created by the absence of automatic locks on the swing gates. The

40

issue on appeal appears to be the causation element: whether the alleged injury-producing feature (absence of automatic locks on the swing gates) was actually part of plans VTA approved for the Pedestrian Crossing. (*Grenier*, *supra*, 57 Cal.App.4th at pp. 940-941.) VTA did not present any direct evidence that the engineers who prepared the plans for the Crossing or the Design Consultant or VTA considered the question of locking gates at the Crossing.

The plaintiffs in *Higgins* argued that the absence of a median barrier on the freeway where their automobile accident occurred was not a design choice made by the approving body. The appellate court disagreed and concluded that the defendant had presented substantial evidence that the design plans did consider the matter. The state's evidence included a declaration from a traffic engineer from Caltrans that median barriers are not required on medians wider than 45 feet, the median at issue was more than 46 feet wide, the location at issue was in conformance with design standards for medians, and the plans approved by the state did not call for the placement of a median barrier. (*Higgins*, *supra*, 54 Cal.App.4th at p. 186; see also *Sutton v. Golden Gate Bridge, Highway, and Transp. District* (1998) 68 Cal.App.4th 1149, 1159-1160 [defendant presented evidence that it commissioned a study by a traffic safety engineer who concluded that a median barrier should not be installed on the Golden Gate Bridge and that it relied on that study when it authorized a design that did not include a barrier].)

There was evidence here that the gates at the Crossing conformed to a design approved by VTA. The plans VTA submitted to the CPUC, which were prepared by professional engineers retained by VTA that had already been approved by the Design Consultant and VTA, specifically called for swing gates with ADA tactile strips at the Crossing, not locking gates. The CPUC Decision specifically approved of the use of swing gates; it did not require a locking gate. And there was evidence that the as-built condition of the gates conformed to the approved plans.

41

In addition, Plaintiff's expert David Rondinone noted that an "automatic pedestrian gate" had been installed at the crossing at the northern end of the station adjacent to Fruitdale Avenue. This supports the inference that the design engineer considered but rejected a similar automatic gate at the Crossing at the southern end of the station. According to Plaintiff's evidence, section 8C.13 of the MUTCD provides in part: "The swing gate alerts pedestrians to the LRT tracks that are to be crossed. Swing gates are designed to open away from the tracks, requiring users to pull that gate open to cross, but permitting a quick exit from the trackway, and to automatically close." A swing gate, as opposed to a locking gate, would permit a pedestrian who was on the Crossing to return safely to the platform and prevent the person from being trapped in the Crossing as a train approached.

We conclude that VTA submitted sufficient evidence to support all three elements of design immunity with regard to the alleged absence of automatic locks on the swing gates. Plaintiff's expert evidence that the Crossing would be safer with a locking gate goes to the reasonableness element. Even if it created a triable issue, it does not preclude summary adjudication. (*Grenier*, *supra*, 57 Cal.App.4th at p. 940.)

### 3. *Failure to Comply with MUTCD Standards Regarding Signs and Warning Devices*

Plaintiff also contends the Crossing is dangerous because the warning signs did not comply with MUTCD standards. In his declaration, Plaintiff's expert John Glennon opined that the design of the Crossing and "the placement of signs and signals combined synergistically . . . to cause the subject accident . . . ." Glennon identified the following alleged MUTCD violations: (1) the flashing railroad signal at the end of the platform was not in the uniform position immediately to the right of the Crossing; (2) the light rail block signals conflicted with other signals; (3) the "No Train Horn" sign was too small and was the wrong shape; and (4) a "No Trespassing" sign on the crossing signal post

42

was misplaced. Glennon also opined that (1) the platform should have been 10 to 20 feet longer to accommodate better placement of the flashing signals; (2) a "049R sign" should not have been in the pedestrian's field of view; (3) there were no signs providing advanced warning of the Crossing; and (4) the "Look Both Ways" and "No Train Horn" signs were not available for view until pedestrians turned right to face the Crossing. (Photographs in the record belie some of these criticisms: (1) there is a second flashing railroad signal immediately to the right of the Crossing; and (2) the "Look Both Ways" sign, the "No Train Horn" sign, and the Crossing are visible before one reaches the end of the platform or the gates.)

The plans prepared by VTA's engineers—which were approved by the Design Consultant, VTA, and the CPUC—included detailed specifications regarding the style and placement of warning signs, with references to MUTCD standards. They also specified the length of the platform. The plans made specific design choices relating to signage, warning devices, and the length of the platform. This was sufficient to satisfy the first two elements of the defense. The CPUC Decision specifically approved of the proposed design and made orders relating to signage and warning devices, thereby satisfying the reasonableness element.

VTA thus met its burden of presenting evidence that satisfies all three elements of the design immunity defense with regard to the alleged dangerous condition based on the signage, warning devices, and length of platform. Plaintiff's evidence, which criticized the reasonableness of VTA's design choices, did not preclude summary adjudication of the design immunity defense.

For all these reasons, VTA is entitled to design immunity as to each of the dangerous conditions Plaintiff has alleged.

43

## DISPOSITION

The summary judgment is reversed. The trial court is directed to vacate its order granting summary adjudication of both causes of action, and summary judgment to VTA. The court is directed to enter a new order (1) denying summary adjudication of the negligence cause of action; and (2) granting summary adjudication of VTA's design immunity defense, which is a complete defense to the dangerous condition of public property cause of action. Each party shall bear its own costs on appeal.

_____

Márquez, J.

WE CONCUR:

_____

 Rushing, P. J.

_____

Elia, J.

Gone v. Santa Clara Valley Transportation Authority
No. H039234